# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

    - vs -

GIDEON VAISMAN,

          Defendant.

Crim. No. 15-0348 (MLC)

## DEFENDANT GIDEON VAISMAN'S
## BRIEF IN SUPPORT OF PRETRIAL MOTIONS

Mark A. Berman, Esq.
Jeremy B. Stein, Esq.
**HARTMANN DOHERTY ROSA**
**BERMAN & BULBULIA, LLC**
65 Route 4 East
River Edge, NJ 07661
mberman@hdrbb.com

*Attorneys for Defendant*
*Gideon Vaisman*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

RELEVANT BACKGROUND ....................................................................................1

FAA REGULATORY FRAMEWORK ......................................................................5

ARGUMENT ...............................................................................................................10

I.      THE COURT MUST DISMISS THE MAIL AND WIRE FRAUD
        COUNTS BECAUSE THEY FAIL TO ALLEGE A DEPRIVATION OF
        PROPERTY. .............................................................................................10

II.     THE COURT MUST DISMISS THE MAIL AND WIRE FRAUD
        COUNTS BECAUSE THEY FAIL TO ALLEGE A SCHEME OR
        ARTIFICE TO DEFRAUD. .....................................................................15

        A.      The Indictment Fails to Allege Intent to Defraud. ....................16

        B.      The Indictment Fails to Allege any Actually False Statements or
                Material Omissions. ....................................................................17

III.    THE COURT MUST DISMISS THE TAX COUNTS BECAUSE THE
        INDICTMENT FAILS TO ALLEGE INTENT TO EVADE TAX. ....................23

IV.     THE TAX COUNTS MUST BE DISMISSED BECAUSE 26
        U.S.C. § 7206(1) IS VOID FOR VAGUENESS AS APPLIED TO
        DEFENDANT, AND OTHERWISE FAIL TO ALLEGE
        "WILLFULNESS." ..................................................................................26

V.      THE COURT MUST DISMISS FRAUD COUNTS ONE THROUGH
        EIGHT AND ELEVEN THROUGH FIFTEEN BECAUSE THEY ARE
        BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS. .................32

VI.     THE COURT MUST DISMISS TAX COUNTS SIXTEEN AND
        TWENTY THROUGH TWENTY-TWO BECAUSE THEY ARE
        BARRED BY THE STATUTE OF LIMITATIONS. ...................................33

VII.    THE COURT SHOULD SUPPRESS EVIDENCE SEIZED BY THE
        GOVERNMENT, AND DISMISS THE INDICTMENT BECAUSE IT
        WAS OBTAINED BASED UPON UNCONSTITUTIONAL SEARCHES ........34

        A.      Background ...............................................................................34

        B.      Warrantless Search.....................................................................36

C.       False Allegations in Search Warrant Application......................................39

D.       Unconstitutional General Search Warrant .................................................43

E.       Unlawfully Executed Search Warrant .......................................................47

F.       Failure to Include Protocols for Search of Electronic Media ...................50

G.       Unsupervised Informant.............................................................................51

VIII.   THE COURT SHOULD GRANT A BILL OF PARTICULARS TO
        CLARIFY CERTAIN VAGUE ALLEGATIONS IN THE INDICTMENT ........52

A.       The Court Should Grant a Bill of Particulars Requiring the
         Government to List the Parts that Were Involved in an Alleged
         "Sham Transactions" and Which Were the Subject of an Alleged
         False Certification, as well as the Identity of the Alleged Victims. ..........53

B.       The Court Should Grant A Bill Of Particulars Requiring the
         Government to Identify the "Others" with Whom Defendant is
         Alleged to Have Conspired or, in the Alternative, the Court Should
         Strike the Allegation. .................................................................................58

C.       The Court Should Grant a Bill Of Particulars to Clarify the
         Allegation that Defendant Vaisman Conspired in the District Of
         New Jersey and "Elsewhere" or, in the Alternative, the Court Should
         Strike the Allegation. .................................................................................62

CONCLUSION.....................................................................................................................63

# TABLE OF AUTHORITIES

## CASES

Andresen v. Maryland, 427 U.S. 463 (1976) ......................................................... 44, 50

Boulware v. United States, 552 U.S. 421 (2008) ......................................................... 25

Carpenter v. United States, 484 U.S. 19 (1987) ......................................................... 11

Cheek v. United States, 498 U.S. 192 (1991) ......................................................... 31, 32

Cleveland v. United States, 531 U.S. 12 (2000) ......................................................... 12

Connally v. General Constr. Co., 269 U.S. 385 (1926) ......................................................... 28

Coolidge v. New Hampshire, 403 U.S. 443 (1971) ......................................................... 36

Elonis v. United States, __ U.S. __, 135 S. Ct. 2001 (2015) ......................................................... 16

Estate of Lisle v. C.I.R., 341 F.3d 364 (5th Cir. 2003) ......................................................... 28

Franks v. Delaware, 438 U.S. 154 (1978) ......................................................... 40

Grenada Indus., Inc. v. C. I. R., 17 T.C. 231 (1951) ......................................................... 26

Holland v. United States, 348 U.S. 121 (1955) ......................................................... 32

In re Search of 3817 W. W. End, First Floor Chicago, Illinois 60621,
    321 F. Supp. 2d 953 (N.D. Ill. 2004) ......................................................... 51

Irwin v. United States, 338 F.2d 770 (9th Cir. 1964) ......................................................... 24

James v. United States, 366 U.S. 213 (1961) ......................................................... 32

Johnson v. United States, 135 S. Ct. 2551 (2015) ......................................................... 28

Kawashima v. Holder, __ U.S. __, 132 S. Ct. 1166 (2012) ......................................................... 25, 31

Lo–Ji Sales, Inc. v. New York, 442 U.S. 319 (1979) ......................................................... 44

Marron v. United States, 275 U.S. 192 (1927) ......................................................... 44

Marshall v. Barlow's, Inc., 436 U.S. 307 (1978) ......................................................... 36

McNally v. United States, 483 U.S. 350 (1987) ......................................................... 11, 14, 15

Murray v. United States, 487 U.S. 533 (1988) ......................................................... 39

San Filippo v. Bongiovanni, 961 F.2d 1125 (3d Cir. 1992) ......................................................... 28

Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602 (1989) ..................................... 37

State Coll. Area Sch. Dist. v. Royal Bank of Canada, 825 F. Supp. 2d 573 (M.D. Pa. 2011) ..... 18

United States v. Adams, 759 F.2d 1099 (3d Cir. 1985) ............................................. 52

United States v. Addonizio, 451 F.2d 49 (3d Cir. 1971) ........................................... 52

United States v. Ahmad, 53 F.R.D. 194 (M.D. Pa. 1971) ............................................ 60

United States v. Alkaabi, 223 F. Supp. 2d 583 (D.N.J. 2002) ................................. 11, 12

United States v. Allocco, 801 F. Supp. 1000 (E.D.N.Y. 1992) ..................................... 60

United States v. Anderson, 31 F. Supp.2d 933 (D. Kan. 1998) ..................................... 59

United States v. Binday, 804 F.3d 558 (2d Cir. 2015) ............................................. 14

United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987) ......................................... 53

United States v. Boumelhem, 339 F.3d 414 (6th Cir. 2003) ......................................... 37

United States v. Boyer, 694 F.2d 58 (3d Cir. 1982) ........................................... 17, 23

United States v. Buchanan, 904 F.2d 349 (6th Cir. 1990) .......................................... 39

United States v. Castellano, 610 F. Supp. 1359 (S.D.N.Y. 1985) ................................... 63

United States v. Christine, 687 F.2d 749 (3d Cir. 1982) ...................................... 44, 45

United States v. Cole, 717 F. Supp. 309 (E.D. Pa. 1989) .......................................... 55

United States v. Coyle, 63 F.3d 1239 (3d Cir. 1995) .......................................... 16, 18

United States v. Critzer, 498 F.2d 1160 (4th Cir. 1974) .......................................... 30

United States v. Cutolo, 861 F. Supp. 1142 (E.D.N.Y. 1994) ....................................... 60

United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988) ...................................... 55, 59

United States v. Egenberg, 441 F.2d 441 (2d Cir. 1971) ........................................... 23

United States v. Espy, 989 F. Supp. 17 (D.D.C. 1997) ............................................. 61

United States v. Feola, 651 F. Supp. 1068 (S.D.N.Y. 1987) ........................................ 63

United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384 (W.D. Pa. 1983) ...................... 56

United States v. Fullmer, 584 F.3d 132 (3d Cir. 2009) ............................................ 29

United States v. Gatto, 746 F. Supp. 432 (D.N.J. 1990) .................................................... 61, 63

United States v. Habig, 390 U.S. 222 (1968) ................................................................... 34

United States v. Hannigan, 27 F.3d 890 (3d Cir. 1994) .................................................... 16

United States v. Hedaithy, 392 F.3d 580 (3d Cir. 2004) ................................................... 11

United States v. Henry, 29 F.3d 112 (3d Cir. 1994) .............................................. 11, 12, 15

United States v. Hickey, 16 F. Supp.2d 223 (E.D.N.Y. 1998) ......................................... 63

United States v. Hill, 459 F.3d 966 (9th Cir. 2006) ........................................................ 51

United States v. Hsia, 24 F. Supp.2d 14 (D.D.C. 1998) ................................................. 60

United States v. Huet, 665 F.3d 588 (3d Cir. 2012) ........................................................ 34

United States v. Jackson, 617 F. Supp. 2d 316 (M.D. Pa. 2008) ..................................... 37

United States v. Jacobsen, 466 U.S. 109 (1984) ............................................................. 36

United States v. Jake, 281 F.3d 123 (3d Cir. 2002) ........................................................ 33

United States v. Lange, 528 F.2d 1280 (5th Cir. 1976) ................................................... 23

United States v. Lanier, 520 U.S. 259 (1997) ................................................................. 29

United States v. Leary, 846 F.2d 592 (10th Cir. 1988) ................................................... 46

United States v. Lonzo, 793 F. Supp. 57 (N.D.N.Y. 1992) ......................................... 60, 63

United States v. Mallas, 762 F.2d 361 (4th Cir. 1985) ................................................... 29

United States v. Mandel, 415 F. Supp. 997 (D. Md. 1976) ............................................. 62

United States v. Marshall, 985 F.2d 901 (7th Cir. 1993) ................................................ 61

United States v. Matlock, 415 U.S. 164 (1974) ............................................................. 35

United States v. McAllister, 18 F.3d 1412 (7th Cir. 1994) .............................................. 52

United States v. McDonnell, 696 F. Supp. 356 (N.D. Ill. 1988) ..................................... 60

United States v. McGuire, 744 F.2d 1197 (6th Cir. 1984) ............................................... 61

United States v. Migliaccio, 34 F.3d 1517 (10th Cir. 1994) ............................................ 22

United States v. Mikanda, 416 F. App'x 126 (3d Cir. 2011) ........................................... 33

United States v. Miller, 527 F.3d 54 (3d Cir. 2008) ........................................................ 34

United States v. Miller, 595 Fed. App'x 166 (3d Cir. 2014) ......................................... 31

United States v. Murdock, 290 U.S. 389 (1933)............................................................. 31

United States v. Nat'l Dairy Products Corp., 372 U.S. 29 (1963).................................. 29

United States v. Novak, 443 F.3d 150 (2d Cir. 2006) .................................................... 14

United States v. Oakar, 924 F. Supp. 232 (D.D.C. 1996)............................................. 60

United States v. Oliva, 46 F.3d 320 (3d Cir. 1995) ....................................................... 32

United States v. Pharis, 298 F.3d 228 (3d Cir. 2002) ................................................... 32

United States v. Phua, 2015 U.S. Dist. LEXIS 47401 (D. Nev. Mar. 20, 2015) ......................... 51

United States v. Poore, 594 F.2d 39 (4th Cir. 1979)..................................................... 61

United States v. Prigmore, 243 F.3d 1 (1st Cir. 2001)................................................... 22

United States v. Recognition Equipment, Inc., 711 F. Supp. 1 (D.D.C. 1989) ........................... 60

United States v. Reddeck, 22 F.3d 1504 (10th Cir. 1994)............................................. 23

United States v. Ritter, 416 F.3d 256 (3d Cir. 2005) ..................................................... 35

United States v. Rogers, 617 F. Supp. 1024 (D. Colo. 1985) ....................................... 60

United States v. Rosa, 891 F.2d 1063 (3d Cir. 1989) .................................................... 53

United States v. Sadler, 750 F.3d 585 (6th Cir. 2014) .................................................. 13

United States v. Shellef, 507 F.3d 82 (2d Cir. 2007)............................................... 14, 15

United States v. Sigal, 341 F.2d 837 (3d Cir. 1965)...................................................... 48

United States v. Smith, 776 F.2d 1104 (3d Cir. 1985).................................................. 53

United States v. Starr, 816 F.2d 94 (2d Cir. 1987) ....................................................... 11

United States v. Strawberry, 892 F. Supp. 519 (S.D.N.Y. 1995) ................................. 60

United States v. Tamura, 694 F.2d 591 (9th Cir. 1982)................................................ 46

United States v. Thevis, 474 F. Supp. 117 (N.D. Ga. 1979)......................................... 63

United States v. Trie, 21 F. Supp.2d 7 (D.D.C. 1998) .................................................. 59

United States v. Vasquez-Ruiz, 136 F. Supp. 2d 941 (N.D. Ill. 2001) .................................. 57, 59

United States v. Vastola, 670 F. Supp. 1244 (D.N.J. 1987) ............................................ 59, 61, 62

United States v. Whitehorn, 710 F. Supp. 803 (D.D.C. 1989) .................................................. 62

United States v. Yusuf, 461 F.3d 374 (3d Cir. 2006) .................................................................. 44

United States v. Zauber, 857 F.2d 137 (3d Cir. 1988) ............................................................... 15

Wilson v. Layne, 526 U.S. 603 (1999) ...................................................................................... 48

Wong Sun v. United States, 371 U.S. 471 (1963) ...................................................................... 50

## STATUTES

18 U.S.C. § 3105 ....................................................................................................................... 48

18 U.S.C. § 3282 ....................................................................................................................... 32

26 U.S.C. § 6531 ....................................................................................................................... 34

26 U.S.C. § 7201 ................................................................................................................... 25, 30

26 U.S.C. § 7206(1) ........................................................................................................... passim

## OTHER AUTHORITIES

"Acceptable Methods, Techniques and Practices – Aircraft Inspection and Repair"
    FAA Advisory Circular 43.13-1B ..................................................................................... 19

"Airframe and Powerplant Mechanics Powerplant Handbook" (FAA 1976) ............................ 19

"Corrosion Control for Aircraft"
    FAA Advisory Circular 43-4A .......................................................................................... 19

"Guide for Developing a Receiving Inspection System for Aircraft Parts and Material"
    FAA Advisory Circular 20-154 (Dec. 12, 2005) ................................................................ 5

"Disposition of Unsalvageable Aircraft Parts and Materials"
    FAA Advisory Circular 21-38 ........................................................................................... 20

"Issuance of Production Approvals Under Subparts G, K, & O"
    FAA Advisory Circular 21-43 ...................................................................................... 20, 21

FAA Legal Interpretations: Letter from FAA Assistant Chief Counsel for Regulations Rebecca
    B. MacPherson to Jason Dickstein (August 6, 2009) ....................................................... 10

FAA Order 8000.87A ................................................................................................................... 2

FAA Order 8120.11 .................................................................................................. 20

FAA Order 8130.21H ................................................................................................ 10

U.S. Dep't of Justice, "Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations" (July 2002) .................................................................................. 51

## **RULES**

Fed. R. Crim. P. 41 .................................................................................................. 48

Fed. R. Crim. P. 7(d) ............................................................................................... 61

Fed. R. Crim. P. 7(f) ................................................................................................ 52

Fed. R. Evid. 801(d)(2)(E) ....................................................................................... 59

## **REGULATIONS**

14 C.F.R. § 145 ................................................................................................... 9, 41

14 C.F.R. § 145.201 ................................................................................................ 42

14 C.F.R. § 145.217 .................................................................................................. 9

14 C.F.R. § 183.29 .................................................................................................... 8

14 C.F.R. § 3.5 ........................................................................................................ 21

14 C.F.R. § 43.10 ...................................................................................................... 5

14 C.F.R. § 43.13 ................................................................................................... 5, 6

14 C.F.R. § 43.2 .................................................................................................... 5, 7

14 C.F.R. § 43.5 .................................................................................................... 7, 8

14 C.F.R. § 43.7 ........................................................................................................ 6

14 C.F.R. § 43.9 .................................................................................................... 8, 9

49 C.F.R. § 44702 ..................................................................................................... 8

## **CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. IV ............................................................................................. 36

## RELEVANT BACKGROUND

Gideon Vaisman is a 77-year old American citizen, born in Israel.  Since 1968, he has devoted his professional life to developing and utilizing new technologies for jet engine component repairs.  The concept of jet engine component repair revolutionized the aviation industry, saving it billions of dollars by obviating the need for operators to purchase new engine parts.  Now, at the end of his career, to be the subject of a 7-year federal criminal investigation, and to be unfairly accused of misunderstanding and distorting FAA rules and regulations, is a deeply painful experience for him.

In February 2009, the Federal Aviation Administration ("FAA") received a tip from an informant that a company called Shelby Aviation, owned by Carmine ("Chuck") Coviello, allegedly was giving Tara Aviation false airworthiness certifications that were then provided to repair stations. Coviello was an employee of Defendant Vaisman's company, Tara Technology, and Vaisman worked in the United States for Tara Aviation, a separate and independently owned company located in Great Britain. The FAA directed the informant to seize copies of the allegedly false certifications from Tara Technology's offices and to give them to the government, which he did. On July 23, 2009, Department of Transportation ("DOT") Special Agent Richard McGrade and non-law enforcement FAA employees executed a search warrant at Tara Technology's offices, based upon information obtained unlawfully by the government's informant. See Ex. A (7/17/09 Search Warrant Application) (hereinafter "2009 Search Warrant").

Two years later, on July 1, 2011, after Coviello was charged and pleaded guilty, the FAA issued a so-called Safety Alert for Operators ("SAFO") entitled "Laundering of Scrapped Jet Engine Parts," the purpose of which was to "alert[] operators, owners and maintenance technicians that scrapped jet engine blades and vanes have been reintroduced into the aerospace system," that "may have been subjected to severe stress or heat (as in a major engine failure, fire or accident)

- 1 -

and could pose a hazard to flight from an in-flight engine shutdown or contained/uncontained engine failures." Ex. B (SAFO 11005).  The FAA recommended that "Owners, operators and maintenance technicians who purchased jet engine blades or vanes that were sourced through Shelby Enterprises, including Tara Aviation or Tara Technologies, should remove them from service."  Id.  Based upon documents received from the FAA in response to a January 15, 2016 FOIA request submitted by counsel for Defendant Vaisman, see Exs. C, D (FOIA Correspondence relating to SAFO 11005), no owner, operator or maintenance technician reported to the FAA that it had removed any part from service or reported any safety issue or any other problem with any part in engine operation  (including the purported "victims" listed in Counts 2-14), even though "[t]he responsibility to implement any action recommended in a SAFO rests with the operator," FAA Order 8000.87A ("establish[ing] safety alerts for operators").

Two years later, on May 14, 2013, the government arrested Defendant Vaisman based upon a criminal Complaint filed under seal a day earlier.  The Complaint alleged that from as early as April 2005 until on or about May 1, 2013, Vaisman conspired with "Carmine Coviello, C.Z. and others to devise a scheme and artifice to defraud FAA repair stations, aircraft parts brokers, and others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises concerning the source of aircraft parts sold in interstate and foreign commerce," in violation of 18 U.S.C. § 1349.  Contemporaneously with the arrest, SA McGrade executed a second search warrant at Tara Technology's offices. See Ex. E (May 13, 2013 Search Warrant Application) (hereinafter "2013 Search Warrant").

On July 10, 2015, the government filed a 23-count Indictment against Vaisman alleging multiple counts of conspiracy, fraud, and tax offenses.  Specifically, the Indictment charges the following counts:

1)     CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD, between 1990 and July 2009, in violation of 18 U.S.C. § 1349;

2)     MAIL FRAUD, on February 15, 2007, in violation of 18 U.S.C. §§ 1341 and 2;

3)     MAIL FRAUD, on February 29, 2007, in violation of 18 U.S.C. §§ 1341 and 2;

4)     MAIL FRAUD, on March 26, 2008, in violation of 18 U.S.C. §§ 1341 and 2;

5)     MAIL FRAUD, on April 23, 2008, in violation of 18 U.S.C. §§ 1341 and 2;

6)     MAIL FRAUD, on May 1, 2008, in violation of 18 U.S.C. §§ 1341 and 2;

7)     MAIL FRAUD, on May 13, 2008, in violation of 18 U.S.C. §§ 1341 and 2;

8)     MAIL FRAUD, on June 27, 2008, in violation of 18 U.S.C. §§ 1341 and 2;

9)     MAIL FRAUD, on April 20, 2009, in violation of 18 U.S.C. §§ 1341 and 2;

10)    MAIL FRAUD, on May 1, 2013, in violation of 18 U.S.C. §§ 1341 and 2;

11)    WIRE FRAUD, on October 16, 2008, in violation of 18 U.S.C. §§ 1343 and 2;

12)    WIRE FRAUD, on October 31, 2008, in violation of 18 U.S.C. §§ 1343 and 2;

13)    WIRE FRAUD, on December 22, 2008, in violation of 18 U.S.C. §§ 1343 and 2;

14)    WIRE FRAUD, on March 24, 2009, in violation of 18 U.S.C. §§ 1343 and 2;

15)    CONSPIRACY TO COMMIT FRAUD INVOLVING AIRCRAFT PARTS, between 1990 and July 2009, in violation of 18 U.S.C. § 38(a)(3);

16)   FILING A FALSE PERSONAL TAX RETURN UNDER
      PENALTIES OF PERJURY, on September 17, 2007, in violation of
      26 U.S.C. § 7206(1);

17)   FILING A FALSE PERSONAL TAX RETURN UNDER
      PENALTIES OF PERJURY, on April 15, 2008, in violation of 26
      U.S.C. § 7206(1);

18)   FILING A FALSE PERSONAL TAX RETURN UNDER
      PENALTIES OF PERJURY, on April 15, 2009, in violation of 26
      U.S.C. § 7206(1);

19)   FILING A FALSE PERSONAL TAX RETURN UNDER
      PENALTIES OF PERJURY, on October 16, 2009, in violation of
      26 U.S.C. § 7206(1);

20)   FILING A FALSE "S CORP" TAX RETURN UNDER
      PENALTIES OF PERJURY, on September 4, 2006, in violation of
      26 U.S.C. § 7206(1);

21)   FILING A FALSE "S CORP" TAX RETURN UNDER
      PENALTIES OF PERJURY, on June 21, 2007, in violation of 26
      U.S.C. § 7206(1);

22)   FILING A FALSE "S CORP" TAX RETURN UNDER
      PENALTIES OF PERJURY, on March 23, 2008, in violation of 26
      U.S.C. § 7206(1); and

23)   FILING A FALSE "S CORP" TAX RETURN UNDER
      PENALTIES OF PERJURY, on April 23, 2009, in violation of 26
      U.S.C. § 7206(1).

Vaisman was arraigned on August 4, 2015, and entered a plea of "not guilty" to each and every

count.

As discussed below, (1) the government has failed to allege the required elements of fraud,

(2) the government has failed to allege the required elements of tax fraud, (3) 19 of the 23 counts

are barred by the applicable statutes of limitations, and (4) the government's investigation, since

its inception, has been irredeemably tainted by violations of the Fourth Amendment.  Therefore,

the Indictment should be dismissed.

## FAA REGULATORY FRAMEWORK

The first 15 counts of the Indictment arise from allegedly fraudulent representations made in connection with the brokering of refurbished aircraft parts by Defendant Vaisman, Shelby Enterprises (owned by Chuck Coviello), and an English company, Tara Aviation, for which Defendant Vaisman worked in the United States.  These allegations all relate to, and require an understanding of, the FAA regulatory scheme applicable to the repair and overhaul of aircraft engine parts, which the government appears not to fully understand.

The blades and vanes inside jet aircraft engines are not life-limited parts. See 14 C.F.R. § 43.10 (defining life-limited parts as "any part for which a mandatory replacement limit is specified in the type design, the Instructions for Continued Airworthiness, or the maintenance manual."). They are "on-condition" parts that may periodically be inspected and, if necessary, overhauled, and then put back in to service.  The overhaul process for blades and vanes includes a variety of tests designed to ensure that the blade or vane continues to be in an airworthy condition – if the part does not measure up (literally, in the case of dimensional testing) then the overhaul cannot be completed and no overhaul tag will be issued.  See, e.g., 14 C.F.R. § 43.2(a)(1) (requiring an article to be inspected and then repaired as necessary as a condition of overhaul) and 14 C.F.R. § 43.13(a) (requiring the work performed to use methods, techniques and practices acceptable to the FAA and identifying the manufacturer's manuals as a source of those methods, techniques and practices).  Properly repaired, blades and vanes can be reinstalled in an engine without any impact on safety or performance.  See "Guide for Developing a Receiving Inspection System for Aircraft Parts and Material," FAA Advisory Circular 20-154, para. 5(b)(11) n.1 (Dec. 12, 2005) (explaining that "[p]arts, which have been maintained, rebuilt, altered, or overhauled, and approved for return to service in accordance with parts 43 and/or 145, are considered to be 'approved parts.'").

- 5 -

Because it is less expensive to buy a repaired part than to purchase new blades and vanes, there is a robust secondary market for overhauled or rebuilt parts, including parts brokers and repair stations servicing the market.  However, persons and entities in the business of brokering the sale of repaired airplane parts (like Defendant Vaisman and Tara Technology) are not regulated by the FAA at all.  And, in that regard, it bears noting that the Indictment does not charge Vaisman with any violation of FAA regulations.

In contrast, the FAA does regulate and certify the privately owned repair stations that inspect and repair used parts.  It is these private repair stations (and not the FAA itself) that certify "airworthiness" and approve overhauled parts for return to service in an aircraft:

> The holder of a repair station certificate may approve an aircraft, airframe, aircraft engine, propeller, appliance, or component part for return to service as provided in Part 145 of this chapter.

14 C.F.R. § 43.7(c).

To certify a part as approved for return to service, an FAA-certified repair station must follow the inspection and repair protocols established by the part's manufacturer and the FAA:

> Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, or other methods, techniques, and practices acceptable to the Administrator .... He shall use the tools, equipment, and test apparatus necessary to assure completion of the work in accordance with accepted industry practices. If special equipment or test apparatus is recommended by the manufacturer involved, he must use that equipment or apparatus or its equivalent acceptable to the Administrator.

14 C.F.R. § 43.13(a).

Repair stations also are required to make a record of their inspections, repairs and approval for return to service, and the repair stations are only permitted to make such records certifying the

- 6 -

approval for return to service once they have complied with the required inspection and repair protocols:

> § 43.2 Record of overhaul and rebuilding.
>
> (a) No person may describe in any required maintenance entry or form an aircraft, airframe, aircraft engine, propeller, appliance, or component part as being overhauled unless—
>
>> (1) Using methods, techniques, and practices acceptable to the Administrator, it has been disassembled, cleaned, inspected, repaired as necessary, and reassembled; and
>>
>> (2) It has been tested in accordance with approved standards and technical data, or in accordance with current standards and technical data acceptable to the Administrator, which have been developed and documented by the holder of the type certificate, supplemental type certificate, or a material, part, process, or appliance approval under part 21 of this chapter.
>
> (b) No person may describe in any required maintenance entry or form an aircraft, airframe, aircraft engine, propeller, appliance, or component part as being rebuilt unless it has been disassembled, cleaned, inspected, repaired as necessary, reassembled, and tested to the same tolerances and limits as a new item, using either new parts or used parts that either conform to new part tolerances and limits or to approved oversized or undersized dimensions.

14 C.F.R. § 43.2.

A repaired part may not be approved for return to service until the FAA-certified repair station has satisfied all of its record-keeping requirements:

> § 43.5 Approval for return to service after maintenance, preventive maintenance, rebuilding, or alteration.
>
> No person may approve for return to service any aircraft, airframe, aircraft engine, propeller, or appliance, that has undergone maintenance, preventive maintenance, rebuilding, or alteration unless–
>
>> (a) The maintenance record entry required by § 43.9 or § 43.11, as appropriate, has been made; [and]
>>
>> (b) The repair or alteration form authorized by or furnished by the Administrator has been executed in a manner prescribed by the Administrator ....

14 C.F.R. § 43.5; see also 14 C.F.R. § 43.9(a) (requiring "each person" who repairs an aircraft engine component to make a record including a signature that "constitutes the approval for return to service only for the work performed").

FAA-certified repair stations often devise their own proprietary repairs to correct issues that were unanticipated or otherwise not addressed in the manufacturer's maintenance manuals, sometimes because the technological know-how to effect the repair had not previously existed. The FAA delegates its authority to approve such repairs to so-called Designated Engineering Representatives ("DERs"), who are individuals employed or contracted by repair stations, and authorized by the FAA to approve unique repair processes. See 49 C.F.R. § 44702(d); 14 C.F.R. § 183.29. Thus, DER repairs are FAA-approved repair processes for parts with flaws or wear-and-tear that other repair stations are not capable of repairing. Consequently, because repair stations have different repair capabilities, a part that is "scrap" for one repair station may be salvageable by another repair station with a proprietary DER repair, and that part is deemed airworthy by the FAA if an authorized person approves the repair and the repair is properly documented by the FAA-certified repair station.

In sum, once a part has been inspected and repaired by an FAA-certified repair station, it is deemed approved by the FAA for return to service in an aircraft. And, FAA-certified repair stations may not return a part to service unless and until they have made a record and found, through their own independent determination that the repaired part is airworthy with respect to the work performed, a determination they make by following the inspection and repair protocols set out by a part's manufacturer or a DER process. Critically, FAA-certified repair stations are not permitted to change their inspection and repair protocols based on information they might receive from a third party (including a parts broker) when a part is submitted for inspection and repair.

- 8 -

That is, FAA-certified repair stations are not permitted to skip steps based on information they receive about a part's history, such as the information the government alleges Defendant Vaisman provided in this case. There is no section of the regulatory scheme that provides for, or allows, repair stations' reliance on the representations of parts brokers. <u>See</u> 14 C.F.R. § 145.217 (imposing strict limitations on a FAA-certified repair station's ability to contract out inspection and repair work, including requiring that "[t]he certified repair station verif[y], by test and/or inspection, that the work has been performed satisfactorily by the noncertificated person and that the article is airworthy before approving it for return to service.").

Accordingly, FAA regulations do not require FAA-certified repair stations or aircraft operators to obtain what the Indictment refers to as "trace paperwork ... [that] documented the history of an aircraft part and included information such as the part's manufacturer, the aircraft on which the part was used, and how the part was used." Indictment, Count One ¶ 2.g. Rather, the FAA has specifically disclaimed any traceability requirement. Specifically, during the course of the government's investigation, when the FAA was presented with a request for clarification as to whether aircraft owners must obtain trace paperwork for replacement parts of unknown origin, the FAA Office of the Chief Counsel responded as follows:

> [In the case of] modification or replacement parts of unknown origin []
> presented for use on type certificated aircraft[,] <u>[y]ou are correct in stating</u>
> <u>that there is no Federal Aviation regulation that requires traceability of an</u>
> <u>aircraft part to its origin</u>. Thus, the question is what showing of proof is
> necessary to establish that modification or replacement parts of unknown
> origin are approved or acceptable for use on type certificated aircraft. ...
> Used parts that are being returned to service may be identified by the records
> required by 14 CFR § 43.9 for approval for return to service.... An approval
> for return to service substantiates that the work performed on the part was
> accomplished in accordance with the requirements of part 43 of the
> regulations. While use of Form 8130-3 is not mandatory, it does help the
> end user determine the airworthiness approval status of parts.

FAA Legal Interpretations: Letter from FAA Assistant Chief Counsel for Regulations Rebecca B. MacPherson to Jason Dickstein (August 6, 2009) (available at http://www.faa.gov/about/office_org/headquarters_offices/agc/pol_adjudication/agc200/interpretations/data/interps/2009/dickstein%20-%20(2009)%20legal%20interpretation.pdf).

Instead of "trace paperwork," the FAA has issued guidance recommending that operators – before installing a repaired part – obtain a Form 8130-3 ("Authorized Release Certificate / Airworthiness Approval Tag"), which is the form FAA-certified repair stations generally use to make the records required under 14 C.F.R. § 43 certifying approval for return to service, or an equivalent document. See FAA Order 8130.21H ¶ 3-1a, ¶ 3-2a ("The use of FAA Form 8130-3 for this purpose is optional, but the FAA recommends its use. This will help aviation authorities and industry to ensure complete traceability and ease the movement of products and articles through the aviation system."). This guidance corresponds to regulations providing that it is FAA-certified repair stations that certify parts as approved for return to service. In this case, the Indictment alleges that, in fact, FAA-certified repair stations inspected and repaired all the parts at issue and executed a Form 8130-3 for each part. See Indictment, Count One ¶ 2.c.-d., ¶¶ 10-11. Contrary to the allegation in the Indictment, there is no FAA-mandated traceability requirement.

## ARGUMENT

### I.    THE COURT MUST DISMISS THE MAIL AND WIRE FRAUD COUNTS BECAUSE THEY FAIL TO ALLEGE A DEPRIVATION OF PROPERTY.

Count One of the Indictment charges a conspiracy to defraud, and Counts Two to Fourteen charge substantive offenses, in violation of the mail fraud and wire fraud statutes. To sufficiently charge a mail fraud or wire fraud violation, an indictment must allege, among other elements, the defendant's knowing and willful participation in a "scheme or artifice to defraud." United States v. Hedaithy, 392 F.3d 580, 590 (3d Cir. 2004). "[T]he object of the alleged scheme or artifice to

defraud must be a traditionally recognized property right."  Id. (citing United States v. Henry, 29 F.3d 112, 115 (3d Cir. 1994)).  That is, the mail and wire fraud statutes only proscribe fraudulent schemes to deprive a victim of "money or property."  Henry, 29 F.3d at 113 (citing McNally v. United States, 483 U.S. 350 (1987) and Carpenter v. United States, 484 U.S. 19 (1987)); United States v. Alkaabi, 223 F. Supp. 2d 583, 588 (D.N.J. 2002) ("McNally made it clear that 18 U.S.C. § 1341 does not reach any 'scheme or artifice to defraud,' but is 'limited in scope to the protection of property rights.'").  Moreover, proof of a scheme or artifice to defraud requires the government to show that the defendant possessed a fraudulent intent, that is, the government "must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims." United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987) ("Only a showing of intended harm will satisfy the element of fraudulent intent.").

Here, even accepting the allegations in the Indictment as true, the purported victims of the charged fraudulent conduct received exactly what they had bargained for, specifically, vanes and blades that had been properly overhauled and certified by an FAA-certified repair station; they were not deprived of a traditionally recognized property right.  Indictment, Count One ¶ 1.e. (identifying the victims of the alleged scheme as "victim aircraft operators or aircraft parts purchasers who, along with other victims, purchased aircraft parts ..."), ¶ 2.b. ("In the United States, aircraft owners ... obtained replacement aircraft parts ... from one of several intermediate sources, including aircraft parts brokers.  Before an aircraft part could be installed on an aircraft ... that part first had to be inspected and certified as 'airworthy.'"), ¶¶ 2.c.-d. ("[T]he FAA certified private repair stations ('FAA Repair Stations') ... to perform inspections and repairs of aircraft parts, and to certify the airworthiness of those parts."), ¶ 10 ("Vaisman would ship the Scrapped Parts to FAA Repair Stations ...."), ¶ 11 (Vaisman "would store the repaired Scrapped Parts ... and

ultimately sell these parts to aircraft operators ....").).   Therefore, Counts One through Fourteen fail to allege a scheme or artifice to deprive a victim of money or property and must be dismissed as a matter of law. See Henry, 29 F.3d at 114 (affirming dismissal of wire fraud indictment because government's theories of the property right of which victim was deprived had not been explicitly charged in the indictment); Alkaabi, 223 F. Supp. 2d at 588-89 (dismissing mail fraud indictment and rejecting government's alternative theories of what property right had been taken).

The Indictment alleges, in cursory form, that Vaisman schemed "to obtain money and property." See Indictment, Count One ¶¶ 3-4, Counts 2-10, ¶ 2, Counts 11-14, ¶ 2. However, obtaining money or property, without depriving a victim of money or property, is not a crime encompassed within the mail and wire fraud statutes.  See Alkaabi, 223 F. Supp. 2d at 587 ("The United States Supreme Court has explained that 'the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property.'") (citing McNally); see also Cleveland v. United States, 531 U.S. 12, 26 (2000) ("We conclude that § 1341 requires the object of the fraud to be 'property' in the victim's hands ....") (emphasis added). Hence, scheming simply to obtain money is not illegal at all.

The Indictment also alleges that Defendant Vaisman sold overhauled aircraft parts to aircraft operators with allegedly "fraudulent trace paperwork" and that "[a]ircraft operators generally would have refused to purchase the aircraft parts and install them on their aircraft had they known [of the allegedly false statements]."  Indictment, Count One ¶ 11.  The Indictment, however, also alleges that the parts sold to aircraft operators were inspected and overhauled by FAA-certified repair stations, and that those repair stations "documented their inspections, repairs, and certifications of aircraft parts on FAA Forms 8130-3, also called 'Airworthiness Approval Tags.'"  Indictment, Count One ¶¶ 2.c.-d., ¶¶ 10, 11.  Under the FAA regulatory framework set

forth above (and referenced in the Indictment), once the parts were certified by an FAA-certified

repair station as "approved for return to service," and documented on a Form 8130-3, the parts

lawfully were approved for return to service.  End of story.

It may or may not be, as the Indictment alleges, that the victims "generally would have

refused to purchase the aircraft parts and install them on their aircraft had they known [of the

alleged misrepresentation]."  See Indictment, Count One ¶ 11. The mail and wire fraud statutes,

however, do not create a federal right to 100% accurate information; rather, the government must

allege and prove that a defendant deprived a victim of property, not just information. See United

States v. Sadler, 750 F.3d 585, 590-91 (6th Cir. 2014) (reversing fraud conviction and rejecting

government argument that defendant's "lies convinced the distributors to sell controlled substances

that they would not have sold had they known the truth," even though one distributor's

representative testified she would have been "concern[ed]" had she known more about defendant's

operation, because the "statute is 'limited in scope to the protection of property rights,' and the

ethereal right to accurate information doesn't fit that description.") (citing McNally, 483 U.S. at

360).

As recognized by the Sixth Circuit in Sadler, there is no deprivation of money or property

even if the victim later testifies that it would not have chosen to enter into the transaction had it

known in advance of a defendant's allegedly false statements.  The Second Circuit has explained:

> It is not sufficient ... to show merely that the victim would not have entered
> into a discretionary economic transaction but for the defendant's
> misrepresentations. The "right to control one's assets" does not render every
> transaction induced by deceit actionable under the mail and wire fraud
> statutes. Rather, the deceit must deprive the victim "of potentially valuable
> economic information." United States v. Wallach, 935 F.2d 445, 463 (2d
> Cir. 1991). "Our cases have drawn a fine line between schemes that do no
> more than cause their victims to enter into transactions they would
> otherwise avoid — which do not violate the mail or wire fraud statutes —
> and schemes that depend for their completion on a misrepresentation of an

essential element of the bargain — which do violate the mail and wire fraud statutes." United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007).

United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015) ("Thus, we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain.").

For example, in United States v. Starr, 816 F.2d 94, 96 (2d Cir. 1987), the defendants processed bulk mailing for their customers, underpaid the U.S. Post Office by concealing high-rate mail in low-rate mail packages, but charged their customers the higher rate and pocketed the difference. Id. at 96. The Second Circuit held that such conduct did not constitute mail fraud against the customers, because they had "received exactly what they paid for" and "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received." Id. at 99.

Similarly, in United States v. Novak, 443 F.3d 150, 159 (2d Cir. 2006), the Second Circuit held that where the defendant's counterparties had "received all they bargained for," it was not sufficient to support a mail fraud conviction that the counterparties might have refused the bargain "had they been aware that [the defendant] would receive a portion of the money" as a personal kickback. See also United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007) (vacating convictions of defendants who induced company to sell them its products by falsely representing that they would not resell the products domestically, because the indictment alleged only that defendants' misrepresentation induced the seller "to enter into a transaction it would otherwise have avoided").

The Third Circuit has explained that this rule derives from the Supreme Court's holding in McNally, where the Supreme Court reversed the mail fraud conviction of a defendant who had awarded insurance contracts to an agency he had an interest in, but did not disclose his interest in the agency and the commissions he received as a result. See United States v. Zauber, 857 F.2d 137, 146-47 (3d Cir. 1988) (citing McNally, 483 U.S. at 360 ("[T]he premium for insurance would

have been paid to some agency, and what [defendants] did was to assert control that the Commonwealth might not otherwise have made over the commissions paid by the insurance company to its agent.")).  The Third Circuit explained in Zauber that such a "loss of control" theory – under which the government alleges that a defendant caused a victim to make a discretionary economic choice it might otherwise not have made, but the victim is not otherwise deprived of any money or property – is "too amorphous to constitute a violation of the mail fraud statute as it is currently written," under the holding in McNally.  Id., 857 F.2d at 147; see also Alkaabi, 223 F. Supp. 2d at 590-91 (citing Zauber for the same proposition); United States v. Henry, 29 F.3d 112, 115 (3d Cir. 1994) ("The issue, therefore, is whether the competing banks' interest in having a fair opportunity to bid for something that would become their property if and when it were received is in itself property. We conclude that it is not.").

Here, the purported victims were in the market to purchase overhauled aircraft parts, certified by an FAA-approved repair station as approved for return to service.  It is indisputable that – no matter what was said to aircraft operators – they received exactly what they had paid for – a certified overhauled part; as the Indictment alleges, each of the parts at issue in this case was overhauled by an FAA-certified repair station and, hence, approved by the FAA for return to service.  See Indictment, Count One ¶ 2.c.-d., ¶¶ 10-11.  Thus, no victim was deprived of money or property.  Accordingly, the Court must dismiss Counts One through Fourteen of the Indictment as a matter of law.

## II.   THE COURT MUST DISMISS THE MAIL AND WIRE FRAUD COUNTS BECAUSE THEY FAIL TO ALLEGE A SCHEME OR ARTIFICE TO DEFRAUD.

The mail and wire fraud statutes proscribe any "scheme or artifice to defraud" in which the defendant participated with the specific intent to defraud and in which the mails were used "in furtherance of the fraudulent scheme." United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994).

Here, the fraud counts fail to allege the requisite specific intent or a scheme involving any actually false statement.  Therefore, Counts One through Fifteen must be dismissed.

### A.      The Indictment Fails to Allege Intent to Defraud.

To charge a violation of the mail fraud and wire fraud statutes, the government must allege that Defendant Vaisman acted with "specific intent to defraud."  United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995).  The required specific intent may be found from a material misstatement of fact made intentionally or with reckless disregard for the truth, id., but proof of a false statement made only negligently does not meet the statute's specific intent requirement. See Elonis v. United States, __ U.S. __, 135 S. Ct. 2001, 2011 (2015) ("We 'have long been reluctant to infer that a negligence standard was intended in criminal statutes'") (quoting Rogers v. United States, 422 U.S. 35, 47 (1975) (Marshall, J., concurring)); United States v. Boyer, 694 F.2d 58, 59-60 (3d Cir. 1982) (affirming fraud conviction where the district court had "carefully distinguished between conduct which is reckless and conduct which is merely negligent").   Here, Counts One through Fifteen must be dismissed because the Indictment fails sufficiently to allege the required element of intent to defraud because it effectively alleges only that the relevant misrepresentations were made negligently, not intentionally or recklessly.

Specifically, the Indictment alleges that Vaisman caused Coviello to make certifications regarding parts prior exposure to severe stress or heat "without any knowledge" as to whether they were true or not.  Indictment, Count One ¶ 8.[1]  At best, however, an allegation that a defendant did

---

[1] The Indictment only alleges that Vaisman directed Coviello to create the Shelby Certifications "without any knowledge" as to their truth or falsity.  Indictment, Count One ¶ 8.  But the Indictment does not repeat that allegation with respect to the Tara Certifications; the Indictment only labels the Tara Certifications "fraudulent and misleading" but does not allege that Coviello/Vaisman created them "without any knowledge" of their truth or falsity.  Indictment, Count One ¶ 9.  This gap in the Indictment's allegations alone is enough to dismiss the fraud counts because the Indictment only alleges that Vaisman sent the Tara Certifications, not the Shelby

not know whether his representation was true or false is an allegation of negligence, which cannot support the imposition of criminal liability. See Elonis v. United States, supra. Intentional or reckless misrepresentations require an allegation and proof of something more than simply not knowing. Indeed, in the civil context, "[n]egligent misrepresentation can be distinguished from intentional misrepresentation in that, to find liability for the former, the defendant need not necessarily have known that his words, when spoken, were untrue; it is sufficient to find liability that the defendant 'failed to make reasonable investigation of the truth of those words.'" State Coll. Area Sch. Dist. v. Royal Bank of Canada, 825 F. Supp. 2d 573, 584 (M.D. Pa. 2011). Thus, a failure to investigate, without more, arises only to the level of negligence. Thus, to charge a state of mind that is greater than negligence, the government must allege (and prove) more than a mere failure to investigate; it must prove knowledge of actual falsity or its equivalent.

Here, the Indictment does not allege that Vaisman made any false statement knowing it was false, or with reckless disregard for the truth. At most it alleges negligence. Accordingly, Counts One through Fifteen must be dismissed.

**B.     The Indictment Fails to Allege any Actually False Statements or Material Omissions.**

A scheme to defraud under the mail fraud and wire fraud statutes "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Coyle, 63 F.3d at 1243. Counts One through Fifteen, however, fail to allege a false statement or material omission; consequently, they must be dismissed.

---

Certifications, to repair stations and aircraft operators. Indictment, Count One ¶¶ 10-11. Thus, even if the government's theory – that making a statement without knowledge of its truth or falsity is a crime, even if the government cannot prove the statement is false – is viable (which it is not), the Indictment must be dismissed because the only criminally actionable certifications (the Shelby Certifications) were never seen by anyone other than Defendants themselves.

The Indictment alleges that Defendant Vaisman directed a co-conspirator, Chuck Coviello:

> to prepare ... fraudulent and misleading trace paperwork on which he certified ... that the Scrapped Parts had 'not been subjected to excessive stress or heat that an FAA overhaul facility would deem to be unsuitable for return to service after appropriate inspection' (the 'Shelby Certifications') ... [and] that 'all used parts were not subjected to severe stress or heat (as in major engine failure, accident or fire)' (the 'Tara Aviation Certifications').

Indictment, Count One ¶¶ 8-9. The Indictment does not allege, however, that any parts in fact had been subjected to excessive heat or stress; indeed, a certification regarding excessive stress or heat is not required by FAA regulations, the relevant terms (i.e., "excessive heat" and "severe stress or heat") are entirely undefined, and the government has on parts and cannot prove that any part, in fact, was subjected to severe or excessive heat or stress.  To the contrary, the Indictment alleges that all of the parts at issue that were sold to customers were, in fact, inspected, repaired, and then certified as approved for return to service by a FAA-certified repair station. See Indictment, Count One ¶¶ 2(c)-(d) ("[T]he FAA certified private repair stations ('FAA Repair Stations') ... to perform inspections and repairs of aircraft parts, and to certify the airworthiness of those parts."), ¶ 10 ("Vaisman would ship the Scrapped Parts to FAA Repair Stations ...."), ¶ 11 (Vaisman "would store the repaired Scrapped Parts ... and ultimately sell these parts to aircraft operators ...."). Because the parts at issue in this case were inspected and approved for return to service by FAA-certified repair stations, they could not have been subjected to "excessive" or "severe" stress or heat; if they had then they would not have passed the overhaul tests.

The Indictment also alleges that Vaisman "would cause" Coviello "to illegally clean, inspect, grit-blast, and/or blend the Scrapped Parts in violation of FAA regulations, in part to conceal that the Scrapped Parts had been scrapped, damaged, broken, and/or rejected for repair by an FAA Repair Station," see Indictment, Count One ¶ 6, and then sent parts to repair stations and

customers "without paperwork that revealed" this, <u>see</u> Indictment, Count One ¶¶ 10-11.[2]  The Indictment, however, does not allege that any parts were actually damaged or broken or previously rejected by an FAA repair station.   To the contrary, the Indictment alleges that the parts sold to customers were, in fact, all first inspected, repaired, and approved for return to service by an FAA-certified repair station. Moreover, as explained above, that a part was rejected by one FAA repair station is immaterial since different repair stations have different DER repair capabilities; a part that one repair station cannot repair (and, hence, considers to be scrap) often can repaired by another repair station that has developed an appropriate DER repair.

Similarly, the Indictment does not allege that any parts sold were actually "scrapped." Instead, the Indictment describes parts consistent with another FAA term: "Salvageable."  "Scrap" is a defined term under the FAA regulatory scheme, meaning "parts the owner has decided to dispose of because he/she considers them to be of relatively little value and unusable for any other reason," FAA Order 8120.11 ¶ 4.a., such as "parts with known non-repairable defects, whether visible or not."  FAA Order 8120.11 ¶ 6.a. (emphasis added).  None of the parts referred to in the Indictment were "scrap" because none had a "known non-repairable defect" and, ultimately they were all repairable, that is, as alleged in the Indictment, each one was inspected, repaired, and

---

[2] As discussed above, the FAA regulates private repair stations; the FAA does not regulate secondary market parts brokers, such as Vaisman or Coviello; there is no regulation applicable to non-regulated entities or individuals barring grit-blasting and the Indictment erroneously alleges that it was illegal for Coviello to grit blast parts.  Indeed, according to the FAA, grit blasting is an acceptable method for cleaning parts before performing a visual inspection.  "Acceptable Methods, Techniques and Practices – Aircraft Inspection and Repair," FAA Advisory Circular 43.13-1B ¶ 6-116 (Sept. 8, 1998); "Corrosion Control for Aircraft," FAA Advisory Circular 43-4A, ¶ 626 (July 25, 1991); "Airframe and Powerplant Mechanics Powerplant Handbook," at 413 (FAA 1976) (directing mechanic to use grit blasting to clean part prior to conducting visual inspection for defects); <u>id.</u> at 414 (directing mechanic to use grit blasting to clean hard carbon deposits from part).

certified for return to service by an FAA-certified repair station.[3]  Thus, the parts referred to in the Indictment were "salvageable," which the FAA defines as "[a]viation parts that are unserviceable (or of unknown status) from an economic point of view, [that] have potential value in an aviation use," including "[n]on-airworthy parts which may be worth storing until restored to an airworthy condition, or until they are shown to be airworthy with adequate documentation and/or testing" – that is, until they are inspected and repaired by an FAA-certified repair station.  FAA Order 8120.11 ¶ 4.b.; see also FAA Advisory Circular 21-43 App'x E ¶¶ 4-6 (distinguishing between "scrap" vs. "salvageable" parts and recommending destruction of scrap parts, but not salvageable parts).  Thus, although the government repeatedly labels the parts as "scrap" in the Indictment, the Indictment itself – which state that the parts were repaired and approved for return to service by an FAA-certified repair station – belie the government's own repeated mischaracterization, indicating that the parts were, in fact, "salvageable," not "scrap." See Indictment, Count One ¶ 11 ("VAISMAN ... would store the repaired Scrapped Parts in Tara Aviation's warehouse inventory").

---

[3] Indeed, operators and repair stations have long been advised by the FAA to mutilate parts deemed truly unsalvageable.  See FAA Advisory Circular 21-38 ¶ 5.a. (cancelled) ("Persons disposing of unsalvageable aircraft parts and materials should, when appropriate, mutilate those parts and materials prior to release.  Mutilation should be accomplished in such a manner that the parts become unusable for their original intended use.  Mutilated parts should not be able to be reworked or camouflaged to provide the appearance of being serviceable, such as by re-plating, shortening and re-threading long bolts, welding, straightening, machining, cleaning, polishing, or repainting."); FAA Advisory Circular 21-43 App'x E ¶ 4 (cancelled Oct. 1, 2015) ("Manufacturers should dispose of scrap products and articles through mutilation, when appropriate. Proper and thorough mutilation of products and articles will ensure they are unusable for their original application and render them incapable of being reworked or camouflaged to provide the appearance of being serviceable."); FAA Order 8120.11 ¶ 7 (cancelled Aug. 16, 2012) ("All FAA inspectors should recommend to persons disposing of scrap aircraft parts and materials that these parts and materials be mutilated prior to release. The inspector should encourage the development of procedures describing the methods of mutilation.").

FAA regulations reflect this approach: It is the physical characteristics of a part that make it airworthy or not, not what anyone reports about the part's physical characteristics.  For instance, 14 C.F.R. § 3.5(b) & (c) prohibit false statements regarding the airworthiness of aircraft parts, but the same regulation also explicitly provide that this prohibition "shall not apply if a person can show that the product [about which a statement was made] is airworthy."  14 C.F.R. § 3.5(d).  In other words, under the FAA's own regulations, no matter what statement is made regarding airworthiness, if a part is shown to be airworthy, it is airworthy.

As mentioned, the government's theory in this case is <u>not</u> that the parts at issue had, in fact, been subjected to excessive stress or heat (because the government does not have any of the parts and cannot prove that they had been subjected to excessive heat or stress) but, rather, that Defendant Vaisman did not know whether or not they had been subjected to excessive stress or heat.  Yet, an individual cannot be guilty of a criminal fraud based upon a statement that is true, whether he knew it was true or not.  <u>See</u>, <u>e.g.</u>, <u>United States v. Prigmore</u>, 243 F.3d 1, 17-18 (1st Cir. 2001) (recognizing that the due process-based "fair warning requirement" recognizes that, in a fraud prosecution premised upon the making of false statements "there has been no crime if the statements were not false ... under an objectively reasonable interpretation of the law imposing the duty. The government does not take issue with this general principle...."); <u>United States v. Migliaccio</u>, 34 F.3d 1517, 1522-23 (10th Cir. 1994) (reversing mail fraud convictions because "[w]ithout evidence that statements on these claims were false, no reasonable juror could have concluded that wrongdoing occurred beyond a reasonable doubt.").

The Third Circuit has never held that proof of even recklessness is sufficient in the absence of proof of actual falsity.  To the contrary, the Court of Appeals has been careful to distinguish

between knowingly false representations, which are intentional representations, and statements

that are not knowingly false, which are merely negligent:

> Carl B. Benson's appeal from a judgment of sentence following his conviction for Mail Fraud and Securities Fraud presents the question, of first impression in this court, whether in prosecutions for violation of 18 U.S.C. §§ 1341, 2 and 15 U.S.C. §§ 77q(a) and 77x it is proper to charge that the specific intent to deceive may be found from a material misstatement of fact made with reckless disregard of the facts. We affirm.
>
> The court instructed that reckless indifference is the equivalent of intentional misrepresentation "because you may not recklessly represent something as true <u>which is not true</u> even if you don't know it if the fact you don't know it is due to reckless conduct on your part." The instruction continued:
>
>> a fraudulent intent is necessary to sustain the charge of a scheme to defraud. An untrue statement or representation <u>which is in fact false</u> only amounts to fraud if the defendant making it either knew the statement to be false and he made it, made the statement with the intent to defraud, or, as I have said, these things were due to recklessness on his part.
>
> The court also carefully distinguished between conduct which is reckless and conduct which is merely negligent.

<u>United States v. Boyer</u>, 694 F.2d 58, 59-60 (3d Cir. 1982) (emphasis added).  The federal courts

have reversed fraud convictions where the government was unable to prove actual falsity:

> The government never established that the affidavit was technically inaccurate. Under other facts and in other circumstances, proof might have been adduced which would support the conclusion of a jury that a crafty and unscrupulous person intended the affidavit to deceive despite its apparent accuracy. This is not such a case. It is our conclusion in this case that the jury could not reasonably have concluded that the evidence and reasonable inferences drawn from it established Lange's intent to deceive beyond a reasonable doubt. Accordingly, Lange's motion for a directed verdict of acquittal should have been granted.

<u>United States v. Lange</u>, 528 F.2d 1280, 1289 (5th Cir. 1976).  And, fraud convictions premised

upon allegedly recklessness misrepresentations have been sustained only where actual falsity has

been established.  <u>See</u> <u>United States v. Egenberg</u>, 441 F.2d 441, 444 (2d Cir. 1971) (affirming

appellant lawyer's conviction "on the charge of falsely stating on Sixten Ehrling's [tax] return of April 17, 1965 that Ehrling did not intend to return to the United States," where "[t]he government proved that appellant had examined Ehrling's file at Columbia Artists Management, Inc., and that this file contained several contracts obligating Ehrling to return to the United States before the end of 1965."); United States v. Reddeck, 22 F.3d 1504, 1507 (10th Cir. 1994) (affirming mail fraud conviction based upon proof of recklessness where "[t]he government showed NAU catalogs listed faculty who had no association with the enterprise, and NAU employees testified Mr. Reddeck mislead them to believe faculty existed in another site. The government also demonstrated NAU catalogs erroneously referred to a Salt Lake City address for the university when the enterprise was actually run from California."); Irwin v. United States, 338 F.2d 770, 774 (9th Cir. 1964) ("One who acts with reckless indifference as to whether a representation is true or false is chargeable as if he had knowledge of its falsity.").

Here, all of the allegedly false and fraudulent representations alleged in Counts One through Fifteen are belied by the Indictment's own allegation that the parts at issue were, in fact, salvageable parts inspected, repaired and approved for return to service by FAA-certified repair stations. The parts were all airworthy. Moreover, the government's theory of fraud – that making a statement without knowing whether it is true or not – fails to satisfy the recklessness standard in the absence of an allegation (and, ultimately, proof beyond a reasonable doubt) that the statement at issue was, in fact, false. Therefore, Counts One through Fifteen must be dismissed as a matter of law.

## III. THE COURT MUST DISMISS THE TAX COUNTS BECAUSE THE INDICTMENT FAILS TO ALLEGE INTENT TO EVADE TAX.

Counts Sixteen through Twenty Three charge Defendant Vaisman with filing false individual and corporate tax returns in violation of 26 U.S.C. § 7206(1). The charge is premised

upon the allegation that "Tara Aviation was Tara Technology's alter ego, that is, Tara Aviation and Tara Technology operated and acted as a single entity in fact." Indictment, Counts 16-19, ¶ 3. The Court must dismiss these tax counts because, under the government's theory of the case, it has failed to allege all of the elements required under Section 7206(1).

Section 7206(1) provides:

> Any person who ... [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony ....

Thus, "the elements of a violation of § 7206(1) include, <u>inter alia</u>, that the document in question was false as to a material matter, that the defendant did not believe the document to be true and correct as to every material matter, and that he acted willfully with the specific intent to violate the law." <u>Kawashima v. Holder</u>, __ U.S. __, 132 S. Ct. 1166, 1172 (2012).

Notably, the government did not charge Defendant Vaisman with tax evasion under 26 U.S.C. § 7201 ("Attempt to evade or defeat tax").  A difference between Section 7201 and Section 7206(1) is that under the former the government must allege and prove a willful attempt to evade taxes. See <u>Boulware v. United States</u>, 552 U.S. 421, 424 & n.1 (2008) (explaining that § 7201 "mak[es] it a felony willfully to attempt in any manner to evade or defeat any tax imposed by the Code. ... A related provision, 26 U.S.C. § 7206(1), criminalizes the willful filing of a tax return believed to be materially false.")  However, in <u>this</u> case, the government should be required to allege (and eventually to prove) an intent to evade taxes because of the nature of the false statement the government alleges Vaisman made.  It has failed to do so.

Specifically, the government alleges that Vaisman filed tax returns that "were not true and correct as to every material matter, in that they failed to report ... income that defendant Vaisman earned" from Tara Aviation. See <u>Indictment</u>, Counts 16-19 ¶ 9, Counts 20-23 ¶ 7.  Defendant

Vaisman did not have any ownership interest in, but only worked in the United States for, Tara Aviation, and the government does not dispute that Vaisman and Tara Technology reported and paid a substantial amount of taxes on income Tara Technology actually received in the form of payments from Tara Aviation. Rather, the government's theory is that Tara Technology was required to pay taxes on all of Tara Aviation's income, regardless of whether that income had been paid to Vaisman or Tara Technology. <u>See</u> Indictment, Counts 16-19 ¶ 5 (listing out Tara Aviation's "aggregate net income") and Counts 16-19 individually (each charging that Tara Aviation's entire aggregate net income is "unreported net income" of Tara Technology). That theory – that all of Tara Aviation's income should have been reported on Vaisman's individual returns and Tara Technology's corporate returns – is premised upon the allegation that "Vaisman controlled all operations at Tara Aviation," <u>see</u> Indictment, Count One ¶ 1(h)(iii), and that "Tara Aviation was Tara Technology's alter ego, that is, Tara Aviation and Tara Technology operated and acted as a single entity in fact," <u>see</u> Indictment, Counts 16-19 ¶ 3.[4] That is, the government's charge is that because Vaisman allegedly controlled both Tara Technology and Tara Aviation, all of Tara Aviation's income was taxable to Tara Technology in New Jersey and had to be reported on Tara Technology's and Vaisman's tax returns.

As a matter of law, however, this theory requires the government to allege (and prove) that Vaisman exercised control over Tara Aviation <u>for the purpose of evading taxes</u>, because common

---

[4] The government alleges that both the "net earnings" of Tara Aviation as well as Vaisman's alleged "withdrawals for purchases" should have been reported as income on Vaisman's returns. <u>See</u> Indictment, Counts 16-19 ¶ 9. The Indictment bases its charges with respect to both of these types of income on its allegation of common control and alter ego. <u>See</u> Indictment, Counts 16-19 ¶ 3. Thus, Defendant's arguments for dismissal apply equally to both forms of allegedly unreported income.

- 25 -

control alone, without intent to evade taxes, is not sufficient to impute the income of one entity to another. As the United States Tax Court has explained:

> The existence of the requisite common ownership or control is not sufficient, however, to justify the application of [the rule allowing the IRS to allocate income between commonly controlled entities]. The Commissioner may make a distribution, apportionment or allocation [under the rule] only 'if he determined (that it) is necessary in order to prevent evasion of taxes or clearly to reflect the income of such (owned or controlled) organizations, trades, or businesses.' The purpose of [the rule] <u>is not to punish the mere existence of common control or ownership, but to assist in preventing distortion of income and evasion of taxes through the exercise of that control or ownership. It is where there is a shifting or deflection of income from one controlled unit to another that the Commissioner is authorized under [the rule] to act to right the balance and to keep tax collections unimpaired.</u>

<u>Grenada Indus., Inc. v. C. I. R.</u>, 17 T.C. 231, 254-55 (1951), <u>aff'd</u> 202 F.2d 873 (5th Cir. 1953) (emphasis added). Thus, even though Section 7206(1) does not on its face require an allegation of intent to evade taxes, the government's charge in this case nevertheless does because the income from allegedly commonly controlled entities cannot be allocated from one to the other without proving intent to evade. In other words, the government cannot prove its case beyond a reasonable doubt without proving control with intent to evade beyond a reasonable doubt.

The Indictment does not allege that Defendant Vaisman controlled Tara Aviation for the purpose of evading taxes; rather, it only alleges that he controlled Tara Aviation. <u>See</u> Indictment, Count One ¶ 1(h)(iii), Counts Sixteen-Nineteen ¶ 3. Therefore, Counts Sixteen through Twenty-Three must be dismissed for failure to allege the required element of intent to evade taxes.

## IV.   THE TAX COUNTS MUST BE DISMISSED BECAUSE 26 U.S.C.§ 7206(1) IS VOID FOR VAGUENESS AS APPLIED TO DEFENDANT, AND OTHERWISE FAIL TO ALLEGE "WILLFULNESS."

The government has charged Defendant Vaisman with filing false tax returns in violation of 26 U.S.C. § 7206(1), based upon the alleged failure to report Tara Aviation's income on his

personal and Tara Technology's corporate tax returns.  The filings were only false, however, if Vaisman had a duty to report Tara Aviation's income on his returns and Tara Technology's returns. The government alleges that Vaisman had such a duty because Tara Aviation was the "alter ego" of Tara Technology. <u>See</u> Indictment, Counts 16-19 ¶¶ 3, 9.  As explained below, this application of Section 7206(1), which turns entirely on the definition and application of the "alter ego" concept in a criminal tax law context, is void for vagueness; alternatively, the government has failed to allege the required element of "willfulness," because what constitutes an "alter ego" for purposes of allocating income from one entity to another is hopelessly vague.

There is no federal statutory definition of an "alter ego" in the tax context.  The little guidance that exists arises from caselaw in the civil tax context, and establishes that there is no set standard for determining what constitutes an alter ego for purposes of allocating income from one entity to another.  Instead, courts use a "totality-of-the-circumstances" test, which requires the court to balance and weigh multiple factors.  <u>See</u>, <u>e.g.</u>, <u>Estate of Lisle v. C.I.R.</u>, 341 F.3d 364, 375 (5th Cir. 2003) ("We have established a non-exhaustive list of factors to consider in determining whether a subsidiary is the alter ego of a parent corporation, but the question is ultimately determined by examining the totality of the circumstances."), <u>mandate</u> <u>modified</u> <u>on</u> <u>unrelated</u> <u>grounds</u> <u>by</u> 431 F.3d 439 (5th Cir. 2005) <u>and</u> 541 F.3d 595 (5th Cir. 2008).

It is axiomatic that, under the Due Process Clause of the Fifth Amendment, a criminal defendant must have been put on notice of the illegality of conduct with which he is charged:

> The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law."  Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.  The prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary

- 27 -

notions of fair play and the settled rules of law, and a statute that flouts it violates the first essential of due process.

Johnson v. United States, 135 S. Ct. 2551, 2556-57 (2015) (internal citations and quotations).  The purpose of the void for vagueness doctrine is to ensure that a statute or standard gives "fair warning" of what constitutes prohibited conduct. See San Filippo v. Bongiovanni, 961 F.2d 1125, 1135 (3d Cir. 1992). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). This determination is made on a case-by-case basis in which the regulation must be examined to see if it is vague as applied to the affected party, see San Filippo, 961 F.2d at 1136, that is, whether it "(1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2) authorizes or even encourages arbitrary and discriminatory enforcement," United States v. Fullmer, 584 F.3d 132, 152 (3d Cir. 2009) ("The inquiry is undertaken on a case-by-case basis, and a reviewing court must determine whether the statute is vague as-applied to the affected party."). This constitutionally mandated fair warning requirement "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." United States v. Lanier, 520 U.S. 259, 266 (1997).

Here, the absence of an established definition of what constitutes an alter ego for purposes of federal criminal tax law makes Section 7206(1) void for vagueness as applied to Defendant Vaisman in this case because it gives no meaningful notice to him as to what conduct is illegal; stated otherwise, the term "alter ego" does not have a meaning sufficiently precise for a man of average intelligence to "reasonably understand that his contemplated conduct is proscribed." United States v. Nat'l Dairy Products Corp., 372 U.S. 29, 32-33 (1963).

Obviously, the government disagrees with the tax treatment of Tara Aviation and Tara Technology.  Indeed, there may or may not be grounds for the government to pursue this matter civilly, to recover additional taxes on top of the taxes Tara Technology and Defendant Vaisman paid on the income received from Tara Aviation.  But the government brought this case as a criminal case, which it cannot do because the alter ego standard is not clearly set and Vaisman was not afforded any notice of the line he could not cross without facing criminal sanctions.  Under similar circumstances, the Fourth Circuit in United States v. Mallas, 762 F.2d 361 (4th Cir. 1985), reversed federal tax convictions where the underlying tax concept (i.e., whether it was appropriate for the defendants to recommend that "the advance minimum royalty was deductible at the taxpayer's option either when the royalty was paid or when the coal was mined and sold") could be subject to different interpretations:

> Nothing here is meant to imply that one of these solutions is not a better construction of tax law, or that civil liability — with appropriate civil penalties — may not be imposed on these defendants for deductions claimed without a foundation in sufficient coal reserves. Compare United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983) with Zmuda v. Commissioner of Internal Revenue, 731 F.2d 1417 (9th Cir. 1984) (criminal conviction vacated but civil liability imposed in connection with same tax shelter). We merely find that there has been no "fair warning ... given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." McBoyle v. United States, 283 U.S. 25, 27 (1931) (Holmes, J.). The government may face a difficult task in translating the deductibility of annual advance minimum royalty payments into language that the common world will understand. But without that fair warning, the government may not institute criminal proceedings. As this court noted in United States v. Critzer, "the appropriate vehicle to decide this pioneering interpretation of tax liability is the civil procedure of administrative assessment," not a criminal prosecution. 498 F.2d at 1164. We therefore reverse these judgments of conviction and remand the case for proceedings consistent with this opinion.

Id. at 364-65. See also United States v. Critzer, 498 F.2d 1160, 1163 (4th Cir. 1974) ("[P]ioneering interpretations of the tax law should not be sought or rendered in criminal prosecutions under § 7201, but rather in civil suits."). Similarly, the government is charging Defendant Vaisman with

- 29 -

having knowingly submitted a false tax return where the alleged falsity is premised upon a "standard" that is indefinite, discretionary, and contingent upon a multi-factored totality-of-the-circumstances analysis, which is applied exclusively in the context of civil enforcement actions. Such an application of Section 7206(1) could not possibly give Vaisman "a reasonable opportunity to understand what conduct it prohibits" and it absolutely "authorizes [and] encourages arbitrary" enforcement of the statute. Id. Therefore, the Court must dismiss Counts 16-23 on the basis that the government's use of Section 7206(1) is unconstitutionally vague as applied in this case.

In addition, Counts 16-23 must be dismissed because the government has failed to allege the element of "willfulness." As discussed above, "the elements of a violation of § 7206(1) include, inter alia, that the document in question was false as to a material matter, that the defendant did not believe the document to be true and correct as to every material matter, and that he acted willfully with the specific intent to violate the law." Kawashima, 132 S. Ct. at 1172. In the context of criminal tax violations, "[w]illfulness ... requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." Cheek v. United States, 498 U.S. 192, 203-04 (1991); United States v. Murdock, 290 U.S. 389 (1933):

> Aid in arriving at the meaning of the word "willfully" may be afforded by the context in which it is used (United States v. Sioux City Stock Yards Co., 162 Fed. 556, 562), and, we think, in the present instance the other omissions which the statute denounces in the same sentence only if willful, aid in ascertaining the meaning as respects the offense here charged. The Revenue Acts command the citizen, where required by law or regulations, to pay the tax, to make a return, to keep records, and to supply information for computation, assessment or collection of the tax. He whose conduct is defined as criminal is one who "willfully' fails to pay the tax, to make a return, to keep the required records, or to supply the needed information. Congress did not intend that a person, by reason of a bona fide misunderstanding as to his liability for the tax, as to his duty to make a return, or as to the adequacy of the records he maintained, should become a criminal by his mere failure to measure up to the prescribed standard of

conduct. And the requirement that the omission in these instances, must be willful, to be criminal, is persuasive that the same element is essential to the offense of failing to supply information.

Id. at 394-96; see also United States v. Miller, 595 Fed. App'x 166, 168-69 (3d Cir. 2014) (applying this standard to Section 7206).

Here, the government has not alleged that Vaisman knew he had a duty to report all of Tara Aviation's income on his individual tax returns or Tara Technology's corporate tax returns. As discussed above, according to the Indictment, such a duty only arises if Tara Aviation was Tara Technology's alter ego. But there is no certainty of "knowing" that one entity is an alter ego of another (absent a prior definitive (discretionary) determination by the IRS) because there is no clear and established standard for defining an alter ego, just a loose, multi-factored, totality-of-the-circumstances balancing test. See James v. United States, 366 U.S. 213, 221-22 (1961) ("We believe that the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by Wilcox at the time the alleged crime was  committed. Therefore, we feel that petitioner's conviction may not stand and that the indictment against him must be dismissed."); Holland v. United States, 348 U.S. 121, 139 (1955) (willfulness "involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income."). Thus, the government has not alleged (and cannot prove) that Vaisman "knew" of a duty to include all of Tara Aviation income on his and Tara Technology's returns on the basis that Tara Aviation was an alter ego of Tara Technology; that determination regarding alter ego status never had been made. See Cheek, 498 U.S. at 201 ("[T]he standard for the statutory willfulness requirement is the voluntary, intentional violation of a known legal duty."). For these reasons, as well, Counts 16-23 must be dismissed.

**V.   THE COURT MUST DISMISS FRAUD COUNTS ONE THROUGH EIGHT AND ELEVEN THROUGH FIFTEEN BECAUSE THEY ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.**

The statute of limitations for mail and wire fraud, conspiracy to commit mail or wire fraud, and conspiracy to commit fraud involving aircraft parts, is five years from the date of commission of the offense.  18 U.S.C. § 3282(a); United States v. Oliva, 46 F.3d 320, 324 (3d Cir. 1995).  The statute of limitations for mail fraud begins to run from the date a defendant "places, deposits, causes to be deposited, takes, or receives mail, or knowingly causes mail to be delivered, as part of the execution of a scheme to defraud." United States v. Pharis, 298 F.3d 228, 234 n.3 (3d Cir. 2002). "The limitations period for wire fraud begins to run when the wire communication is transmitted." United States v. Mikanda, 416 F. App'x 126, 128 (3d Cir. 2011). And, the statute of limitations for conspiracy runs from the date of the last overt act in furtherance of the conspiracy. United States v. Jake, 281 F.3d 123, 129 n.6 (3d Cir. 2002).

Here, the Indictment was filed on July 10, 2015.  Prior to the return of the Indictment, the government and Defendant Vaisman entered into seven successive tolling agreements, which tolled the statute of limitations for 457 days, from February 11, 2014 through May 13, 2015.[5] Thus, only fraud offenses committed within 5 years plus 457 days prior to July 10, 2015 –- that is, on or after April 9, 2009 -– are within the statute of limitations.

Counts Two through Eight must be dismissed because they allege mail fraud offenses committed on dates between February 15, 2007 and June 27, 2008.  Counts Eleven through Fourteen must be dismissed because they allege wire fraud offenses committed between October

---

[5] The government served MLATs in Europe.  Defendant will leave to the government in the first instance any argument that the MLATs impacted the running of the statutes of limitations.

16, 2008 and March 24, 2009.  Each of these charged substantive counts of mail fraud and wire fraud involved a mailing or wiring that occurred prior to April 9, 2009.

Similarly, Counts One and Fifteen – which charge Defendant Vaisman with conspiracy to commit mail and wire fraud and conspiracy to commit fraud involving aircraft parts – must be dismissed because they do not allege any overt act on or after April 9, 2009.  The Indictment alleges without particularity that Vaisman's conduct extended "from in or about 1990 ... through in or about 2009." Indictment, Count One ¶ 5; see also id. ¶ 7 ("For example, from in or about 2000 through in or about 2009 ...."), Count Fifteen ¶ 1 (incorporating Count One ¶¶ 5-13). By being deliberately vague regarding the date of any overt act committed in 2009 – i.e., whether such overt acts were committed after the April 9, 2009 cutoff – the Government has denied Vaisman his "right to an indictment [that] sufficiently inform[s] him of the charges against him so that he may prepare his defense and not be misled or surprised at trial."  United States v. Miller, 527 F.3d 54, 69-70 (3d Cir. 2008); see also United States v. Huet, 665 F.3d 588, 595 (3d Cir. 2012) (holding that indictment must include "sufficient factual orientation to permit a defendant to prepare his defense" including by "specif[ying] the time period during which the violations occurred."). Therefore, all of these counts must be dismissed under the applicable five-year statute of limitations.

## VI.   THE COURT MUST DISMISS TAX COUNTS SIXTEEN AND TWENTY THROUGH TWENTY-TWO BECAUSE THEY ARE BARRED BY THE STATUTE OF LIMITATIONS.

The statute of limitations for violations of 26 U.S.C. § 7206(1) requires that an indictment be returned and filed within six years of the offense.  The statutory period begins to run from when the alleged false tax filing was made.  26 U.S.C. § 6531(5); United States v. Habig, 390 U.S. 222,

223 (1968).  Therefore, as discussed above, only tax offenses committed on or after April 9, 2008, are within the six-year statute of limitation.

Here, Counts Sixteen, Twenty, Twenty-One, and Twenty-Two allege tax return filings before April 9, 2008.  Accordingly, those counts must be dismissed under the applicable six-year statute of limitations.

## VII.    THE COURT SHOULD SUPPRESS EVIDENCE SEIZED BY THE GOVERNMENT, AND DISMISS THE INDICTMENT BECAUSE IT WAS OBTAINED BASED UPON UNCONSTITUTIONAL SEARCHES.

The investigation of this case began with a warrantless search, continued with an unconstitutionally general search warrant that relied on false allegations, followed by the execution of that search warrant by officers unauthorized by law (or by the Magistrate Judge) to execute it. Beyond these unconstitutional searches and seizures, the government allowed its informant to run amuck, permitting him to eavesdrop on attorney-client communications.  These multiple errors require dismissal of the Indictment and/or suppression of all of the evidence seized from Tara Technology's office.[6]

### A.    Background

The government's seven-year investigation commenced with a warrantless search of the offices of Defendant Vaisman's company, Tara Technology Corp., in February 2009.  Specifically, as confirmed by the contemporaneous activity log prepared by the FAA officials in charge of the

---

[6] "On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). The government must meet this burden by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164 (1974).

administrative inquiry,[7] the government instructed an unidentified informant to take documents from Tara Technology's offices and to give them to the government:

> 2/5/09 - CONTACTED COMPLAINANT TO REQUEST THE DOCUMENTS.... I REQUESTED A COPY OF CERTS SHELBY GIVES TO TARA, WHAT TARA GIVES TO THE REPAIR STATIONS THAT ARE RECERTIFYING THE COMPONENTS AND WHAT THE REPAIR STATIONS ARE GIVING BACK TO TARA AFTER REPAIR.  HE STATED HE WILL DROP OFF THE DOCUMENTS TOMORROW, 2/6/2009.
>
> 2/6/09 – WE RECEIVED THE DOCUMENTS AND INSPECTOR MANCUSO SCANNED AND EMAILED THEM TO INSPECTOR JANCO.

See Ex. F (FAA Activity Logs).

Later, on July 23, 2009, Department of Transportation ("DOT") Special Agent Richard McGrade and non-law enforcement FAA employees executed a search warrant at Tara Technology's offices, based upon information obtained unlawfully by the government's informant. See Ex. A (2009 Search Warrant).  As confirmed by the FAA's activity log, the search was conducted by non-authorized FAA employees:

> 7/23/09 – SEARCH WARRANT EXECUTED AT TARA. INSPECTOR MANCUSO AND THIS INSPECTOR [Fred Grill] WENT THRU THE WAREHOUSE OF TARA AND PULLED FROM THEIR INVENTORY A VARIETY OF BLADES AND VANES WITH QUESTIONABLE CERT DOCUMENTS. ALL COMPONENTS DOCUMENTED AND GIVEN TO DOT IG.

See Ex. F.

On May 14, 2013, the government arrested Defendant Gideon Vaisman based upon a criminal Complaint filed under seal a day earlier.  Contemporaneously with the arrest, SA

---

[7] The FAA activity logs were obtained by prior defense counsel in response to a FOIA request.

McGrade executed a second search warrant at Tara Technology's offices. See Ex. E (2013 Search Warrant").

    **B.**    **Warrantless Search**

The Fourth Amendment to the United States Constitution provides, in relevant part, that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971). A warrantless search of a business is unreasonable on its face. Marshall v. Barlow's, Inc., 436 U.S. 307, 315 (1978) ("The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents. That an employee is free to report, and the Government is free to use, any evidence of noncompliance with OSHA that the employee observes furnishes no justification for federal agents to enter a place of business from which the public is restricted and to conduct their own warrantless search."). And, "[a]lthough the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 614 (1989). See also Coolidge, 403 U.S. at 487 ("Where a private party acts as an 'instrument or agent' of the state in effecting a search or seizure, Fourth Amendment interests are implicated.").

Here, the January 2009 search, which began the government's investigation, was unlawful and warrantless – the government knew of and acquiesced in the intrusive conduct and the informant performed the search (and seizure) with the intent of assisting the government.  See United States v. Jackson, 617 F. Supp. 2d 316, 325 (M.D. Pa. 2008) ("While the Third Circuit has yet to articulate a test for use in determining an individual's private or governmental status, eight of its ten sister courts of appeals have focused the inquiry on the following factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends.").  Specifically, shortly after an informant apparently tipped the FAA to possible improprieties by Chuck Coviello, who owned Shelby Enterprises, the FAA directed the informant to return to Tara Technology's offices and seize crucial documents without a warrant. The informant did so, acting at the behest of the government and as the government's agent, thereby tainting the government's entire investigation. See United States v. Boumelhem, 339 F.3d 414, 425 (6th Cir. 2003) ("[P]ermitting the government to circumvent the limits of the Fourth Amendment by directing individuals to conduct searches that the government cannot, would totally undermine the purposes of the Fourth Amendment.").

The chronology prepared by the FAA officials in charge of the inquiry at the time is explicit, as the following excerpts from the FAA's activity log for that period make clear:

> 2/5/09 - CONTACTED COMPLAINANT TO REQUEST THE DOCUMENTS.... I REQUESTED A COPY OF CERTS SHELBY GIVES TO TARA, WHAT TARA GIVES TO THE REPAIR STATIONS THAT ARE RECERTIFYING THE COMPONENTS AND WHAT THE REPAIR STATIONS ARE GIVING BACK TO TARA AFTER REPAIR.  HE STATED HE WILL DROP OFF THE DOCUMENTS TOMORROW, 2/6/2009.

> 2/6/09 – WE RECEIVED THE DOCUMENTS AND INSPECTOR MANCUSO SCANNED AND EMAILED THEM TO INSPECTOR JANCO.

See Ex. F (FAA Activity Log).

The documents the informant seized were qualitatively critical to this case.  They were the very documents – the alleged "fraudulent and misleading trace paperwork" – which, the Indictment now charges, contained the alleged misrepresentations made to the alleged victims of the fraud.  Consequently, it is clear that the government would not have obtained an Indictment without the critical assistance provided by the documents unlawfully seized by a government agent acting without a warrant.

Those documents are at the core of the charges in this case and provided crucial confirmation of the informant's credibility.  They enabled the government to understand the next steps it needed to pursue as the matter moved from an FAA inquiry to a DOT Inspector General/US Attorney investigation.   To repeat, these were not just a handful of documents, rather, they were the very documents the government charges Coviello used with Vaisman to deceive repair stations and customers.  In addition, the informant took this early directive from the FAA as a license to seize numerous other documents and supply information for the next six months, before the first warrant was sought. This same government informant continued to work at Vaisman's company until December 2009, and collected information for the government without a warrant.

These are the kinds of circumstances that the Supreme Court long ago recognized as sufficient to doom an investigation, notwithstanding a subsequent search warrant.  See Murray v. United States, 487 U.S. 533, 543 (1988).  Specifically, the Supreme Court explained in Murray:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here.  This would not have been the case if [1] the agents' decision to seek the warrant was prompted by what they had seen during

the initial entry, or [2] if information obtained during that entry was presented to the magistrate and affected his decision to issue the warrant.

Id. See also United States v. Buchanan, 904 F.2d 349, 357 (6th Cir. 1990) (rejecting the inevitable discovery exception where the government cannot show that it was pursuing an alternate line of investigation at the time the informant/government agent made an illegal search of the premises or that it possessed the leads necessary to make the discovery of the alleged misconduct without the illegal search). As Murray makes clear, taint does not require the unlawfully seized information to have been presented to the magistrate.  Instead, the government must prove that it would have gotten to the stage of requesting that warrant without the momentum provided by the product of the unlawful seizure.

Here, the FAA Activity Log indicates that the government specifically directed its agent (the informant) to conduct an illegal search in order to develop the investigation to a point where it was turned over to the United States Attorney's office and the Inspector General.  See Ex. F (FAA Activity Log at 2/13/09) ("With Inspector Mancuso, met with SA McGrade and gave him documentation we had received from the individual at Tara.").  It was SA McGrade who then, having received the illegally obtained documents, applied for the search warrant.  See Ex. A (2009 Search Warrant).  Consequently, the taint from this warrantless seizure pervaded the entire investigation from the outset, and the Court must dismiss the Indictment.

### C.  False Allegations in Search Warrant Application

The Supreme Court has referred to the Warrant Clause as the "bulwark of Fourth Amendment protection."  Franks v. Delaware, 438 U.S. 154, 164 (1978).  Accordingly, the Supreme Court in Franks held that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant application and, thus, challenge the validity of any warrant that issued based on such an affidavit, because without

that right, the Fourth Amendment protection would be eviscerated.  Id. at 168 ("[A] flat ban on impeachment of veracity could denude the probable-cause requirement of all real meaning."). Therefore, if a defendant can make a preliminary showing that the affiant either knowingly or with reckless disregard for the truth included false statements in the affidavit of probable cause, and that such statements were necessary to the finding of probable cause, then the defendant must be given the opportunity to prove these facts at a so-called Franks hearing.  Id. at 155-56.

In this case, the affidavits of probable cause submitted by the government in applying for the search warrants in 2009 and 2013 included plainly false statements.  In both affidavits, SA Richard McGrade states that "FAA Repair Stations use historical or 'trace' paperwork associated with an aircraft part to determine whether that aircraft part is repairable and ultimately airworthy." See Ex. A (2009 Search Warrant, Attachment C ¶ 8); Ex. E (2013 Search Warrant, Attachment C ¶ 8).  That statement is false.  As discussed above, FAA regulations require FAA-certified repair stations to follow strict inspection and repair protocols, established by parts manufacturers, in order to certify a part as approved for return to service. That is, FAA regulations explicitly require repair stations actually to inspect and then repair parts before certifying them as approved for return to service, prohibiting repair stations from skipping manufacturer-mandated inspections and repairs or blithely relying on "trace paperwork."  It is not true that FAA repair stations generally use trace paperwork to determine whether an aircraft part is airworthy; any FAA repair station that does so is in clear violation of FAA regulations.

SA McGrade made this statement knowing it was false, or at least with reckless disregard for the truth or falsity of the statement.  SA McGrade is an agent of the Department of Transportation's Office of the Inspector General, and the FAA is an "operating administration" of the Department of Transportation.  See Ex. A (2009 Search Warrant, Attachment C ¶¶ 1, 5).  In

that position, SA McGrade certainly must be charged with knowledge of FAA regulations, or at the very least, awareness of FAA regulations generally and access to FAA experts on the FAA's regulations.   Thus, when SA McGrade averred that FAA-certified repair stations use trace paperwork to determine a part's airworthiness, when in fact to do so would be a blatant violation of FAA regulations, he did so either knowing it was false or with reckless disregard for the truth.

SA McGrade acknowledged in his affidavits that the "FAA specifically certifies private repair stations to perform inspections and repairs of aircraft parts, and to certify the airworthiness of those parts," and he cited 14 C.F.R. § 145 for this proposition. See Ex. A (2009 Search Warrant, Attachment C ¶ 7 & n.1); Ex. E (2013 Search Warrant, Attachment C ¶ 7 & n.1).   He also referenced FAA certified repair stations' use of the FAA Form 8130-3 "Airworthiness Approval Tag."   See Ex. A (2009 Search Warrant, Attachment C ¶ 7); Ex. E (2013 Search Warrant, Attachment C ¶ 7); see also supra at 10 (discussing the use of Form 8130-3).   Section 145 of Title 14 of the Code of Federal Regulations specifically references 14 C.F.R. § 43, which explicitly requires FAA repair stations to follow the strict inspection and repair protocols in determining the airworthiness of a part and bar the use of any other information, such as trace paperwork.   See 14 C.F.R. § 145.201 ("Privileges and limitations of certificate" (explicitly referencing § 43 and its requirements)); supra at 5-8 (citing the relevant sub-sections of § 43).   And, the FAA Form 8130-3 requires a repair station to explicitly certify that "the work ... was accomplished in accordance with Title 14, Code of Federal Regulations, part 43 and in respect to that work, the items are approved for return to service."   See Sample Form 8130-3 (attached as Ex. G).   SA McGrade certainly was aware of, or recklessly disregarded knowledge of, the regulatory requirement that repair stations actually perform inspections and repairs consistent with manufacturers' repair manuals, not rely on trace paperwork, when he made his false statements in the affidavits.

These false statements in the 2009 and 2013 affidavits were the linchpins of the probable cause finding, and without them, there could be no probable cause finding based on the affidavits. An element of a violation of the federal fraud statutes, as discussed above, is that the alleged false statements are "material." Supra at 16 (citing Coyle, 63 F.3d at 1243). According to the affidavits, the false statements included in the trace paperwork sent to FAA repair stations were material because "FAA Repair Stations use historical or 'trace' paperwork associated with an aircraft part to determine whether that aircraft part is repairable and ultimately airworthy." See Ex. A (2009 Search Warrant, Attachment C ¶ 8); Ex. E (2013 Search Warrant, Attachment C ¶ 8). Had SA McGrade truthfully written that FAA repair stations are not permitted to "use" trace paperwork in determining whether a part is airworthy, there would be no basis in the affidavits at all for a finding that the alleged false statements were material.

Last, the 2009 affidavit also included a second false statement, which SA McGrade made in an apparent attempt to scare the Magistrate Judge into issuing the warrant. The 2009 affidavit stated that "Tara Technology is engaging in a pervasive scheme to defraud FAA Repair Stations and customers as to the source and quality of vital jet engine parts, and this scheme is ultimately creating a significant risk to public safety." See Ex. A (2009 Search Warrant, Attachment C ¶ 16). This statement is false – and SA McGrade knew or should have known it – for the same reason that the first statement is false: FAA certified repair stations are required to inspect and repair parts in exactly the same manner, no matter whether they receive trace paperwork with the part or not or what that paperwork says. There could not be any risk to public safety from the alleged scheme because FAA certified repair stations actually inspect and repair parts, they are not permitted to rely on trace paperwork.

The 2013 affidavit itself confirms that the statement in the 2009 affidavit was false.  In his 2013 affidavit, SA McGrade revised this statement to acknowledge that there was no actual risk created, stating only that "this scheme was creating a potential risk to public safety" (as opposed to a "significant risk" per the 2009 affidavit).  See Ex. E (2013 Search Warrant, Attachment C ¶ 19).  McGrade was forced to make this change because by 2013 he had to admit that there was no risk.  The FAA had issued the SAFO on July 1, 2011, recommending that aircraft owners, operators and maintenance technicians remove from service parts sourced through Tara Aviation or Tara Technologies.  See Ex. B.  In response to this SAFO, the FAA received exactly zero reports of any safety issues arising from any Tara Aviation parts.  See Ex. D (Feb. 26, 2016 FAA FOIA Response) (disclosing that the FAA had received no communications in response to the SAFO); See Ex. C (Feb. 10, 2016 FAA FOIA Response) (disclosing only communications from the FAA to aircraft operators and repair stations alerting them to the SAFO, but no reports from any owners, operators or repair stations that anyone had found any safety issues with any Tara Aviation parts).  SA McGrade manufactured the appearance of a public safety issue to induce the Magistrate Judge to issue the warrant.

On this record, Defendant has made a substantial showing that the affidavits of probable cause in this case included false statements, made knowingly or with reckless disregard for the truth, and that those statements were necessary to the finding of probable cause.  Therefore, the Court should order a Franks hearing, so that the Court can determine whether the statements were false and whether the warrants must be invalidated.

### D.   Unconstitutional General Search Warrant

In July 2009, the government conducted a search of Tara Technology's office pursuant to a search warrant.  The government's warrant, however, which allowed the government to rummage

- 43 -

through all of Vaisman's papers, was unconstitutionally general.  Therefore, the Court should suppress all of the evidence seized by the government and dismiss the Indictment.

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment prohibits general warrants. Andresen v. Maryland, 427 U.S. 463, 480 (1976); Marron v. United States, 275 U.S. 192, 195 (1927). A valid warrant must describe the place to be searched and the items to be seized with particularity. The Fourth Amendment's particularity requirement is designed to "make[] general searches ... impossible." United States v. Christine, 687 F.2d 749, 752 (3d Cir. 1982) (quoting Marron, 275 U.S. at 196). A warrant is impermissibly general if it authorizes "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). Evidence seized pursuant to a general warrant must be suppressed. Lo–Ji Sales, Inc. v. New York, 442 U.S. 319 (1979); see also United States v. Yusuf, 461 F.3d 374, 393 n. 19 (3d Cir. 2006) ("[T]he only remedy for a general warrant is to suppress all evidence obtained thereby.").

The warrant executed by the government in July 2009 must be invalidated as general because it "vest[ed] the executing officers with unbridled discretion to conduct an exploratory rummaging through [Defendant's] papers in search of criminal evidence." Christine, 687 F.2d at 753.  Indeed, the warrant was so impermissibly general that it allowed the seizure of virtually everything at Tara Technology, including materials dating back to 15 years before the company was even formed.  The warrant permitted the seizure of:

> a.      "Aircraft parts, FAA aircraft part certification records, trace paperwork, FAA Airworthiness Approval Tags (Forms 8130), inventory lists, import and export records, customer lists, correspondence, billing

- 44 -

records, invoices, purchase orders, journals, telephone diaries and message pads, testing documents, videos, ledgers, handwritten and other notes; appointment books, planners and calendars, shipping records, schedules of accounts receivable, schedules of accounts payable, receipts of payment (i.e., checks and deposit slips), bank statements, documents containing addresses and telephone numbers of business associates, documents pertaining to contracts, agreements, reports, and memoranda, and any other documents and evidence relating to pertaining to importing, exporting, transferring, receiving, repairing, using, testing and returning to service aircraft parts, as to both domestic or international parties and transactions, from approximately 1989 through the present;

b.      Any photocopying or scanning devices and any related equipment.

c.      Computer material and equipment related to the above documents, material, and evidence, including:

i.      Any computer equipment and storage device capable of being used to store the above documents, materials, and evidence;

ii.      Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of the above documents, materials, and evidence, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii.      Any magnetic, electronic, or optical storage device capable of storing the above documents, materials and evidence, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, zip drives, thumb drives, electronic dialers, electronic notebooks, and personal digital assistants;

iv.      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

v.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.      Any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

- 45 -

> vii.    Any passwords, password file6, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

(2009 Search Warrant, Attachment B.)  This breathtakingly broad warrant is too general to survive constitutional scrutiny. See United States v. Tamura, 694 F.2d 591, 595 (9th Cir. 1982) ("It is highly doubtful whether the wholesale seizure by the Government of documents not mentioned in the warrant comported with the requirements of the fourth amendment.... It is true that all items in a set of files may be inspected during a search, provided that sufficiently specific guidelines for identifying the documents sought are provided in the search warrant and are followed by the officers conducting the search. However, the wholesale seizure for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.'") (quoting United States v. Abrams, 615 F.2d 541, 543 (1st Cir. 1980)).

The Tenth Circuit's holding in United States v. Leary, 846 F.2d 592 (10th Cir. 1988) is instructive.  There, "the warrant under scrutiny included only two limitations. First, the documents to be seized had to fall within a long list of business records typical of the documents kept by an export company. Second, those documents had to relate to 'the purchase, sale and illegal exportation of materials in violation of the' federal export laws." Id. at 600-601.  The Court of Appeals held that "in this context – the search of the offices of an export company – these limitations provide no limitation at all. The warrant authorizes, and the customs agents conducted, a general search of the Kleinberg offices." Id. at 601.  In so holding, the court noted that "reference to a broad federal statute is not a sufficient limitation on a search warrant" and "if items that are illegal, fraudulent, or evidence of illegality are sought, the warrant must contain some guidelines to aid the determination of what may or may not be seized." Id. at 601-602.

Here, the government's search warrant was similarly overbroad on its face. It allowed the government to conduct a general search of Tara Technology's office by rummaging through all of its contents; indeed, the government ultimately seized every single piece of paper through there was no reasonable basis to believe that every business record of Tara Technology was potentially relevant to the government's investigation.

A warrant authorizing the government to rummage through Tara Technology's office without any particularity regarding the items to be search or seized would be a classic general warrant. Yet, there is no difference between such an obviously unconstitutional warrant and one – like the one relied upon by the government here – which lists every generic category of material that one can find in <u>any</u> professional office. Indeed, to the extent the warrant imposed <u>any</u> limitations on law enforcement, the affidavit here was so broad that it made it impossible to distinguish any records that should or should not be subject to the search. Because the government's search warrant effectively was a general warrant, it must be invalidated.

### E.    <u>Unlawfully Executed Search Warrant</u>

Even if the government's search warrant was valid on its face, the government conducted its search of Tara Technology's office in a patently unconstitutional fashion. By statute, a search warrant must be executed "by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution." 18 U.S.C. § 3105. <u>See</u> <u>United States v. Sigal</u>, 341 F.2d 837, 843 (3d Cir. 1965) (holding that Section 3105 "confers no substantive authority to execute a warrant, but was intended to enlarge the common law rule that a search warrant must be directed to a particular person and executed by that person"). And, it is unconstitutional for an authorized officer to bring along third parties who are not needed to execute the search warrant. <u>Wilson v. Layne</u>, 526 U.S. 603, 611 (1999) (holding that it was a violation of the Fourth Amendment "for police to bring ... third parties into a home

during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant"). Here, SA McGrade was the only officer authorized to execute the July 2009 search warrant. Nevertheless, the FAA inspectors that entered Tara Technology's premises in July 2009 did not simply "assist" the agent from DOT OIG in the execution of the search but, rather, by their own admission, exercised critical discretion unguided by the law enforcement officer authorized to conduct the search. Consequently, the Court should suppress all of the evidence seized.

The FAA activity log prepared by one of the FAA inspectors who executed the search (Fred Grill) states:

> 7/23/09 – SEARCH WARRANT EXECUTED AT TARA. INSPECTOR MANCUSO AND THIS INSPECTOR [Fred Grill] WENT THRU THE WAREHOUSE OF TARA AND PULLED FROM THEIR INVENTORY A VARIETY OF BLADES AND VANES WITH QUESTIONABLE CERT DOCUMENTS. ALL COMPONENTS DOCUMENTED AND GIVEN TO DOT IG.

An FAA inspector, however, does not qualify as a federal law enforcement officer authorized to execute a search warrant. Fed. R. Crim. P. 41(a)(2)(C), (e)(1). And, their participation in the search of Tara Technology's offices in July 2009 produced a constitutionally unacceptable result. It is clear here that there was no need for any unauthorized person to assist in this particular search and even if there was, the assistance was rendered without the guidance of an authorized person.

First, the Officer authorized to execute the warrant, DOT SA McGrade, did not need assistance of FAA inspectors because he himself is an experienced investigator of FAA-related criminal offenses. By his own admission, SA McGrade has investigated numerous aviation-related crimes and was a professed expert in the field. Ex. A (2009 Search Warrant, Attachment C ¶¶ 1-2.) Moreover, because this was his investigation, he knew or should have known what would be relevant to an aviation fraud case. Moreover, it is quite clear that little "expertise" if any was

applied to the search because nearly everything on Tara Technology's premises was seized.  So the notion that a trained FAA eye was needed is belied by the results.

Second, if the government needed two FAA inspectors to conduct this search, there was ample time to seek the authorization of their participation by a Magistrate Judge.  Yet, the government failed to obtain such authorization.

Third, even in those instances in which the government is permitted to utilize an unauthorized person in executing a search warrant, the courts require that the unauthorized person be supervised by an authorized person. Here, the FAA inspectors were not supervised at all.  We know this because the FAA inspector who prepared the report dutifully noted whenever he or his fellow inspector consulted with the DOT OIG agent during the course of their investigation. Notably absent from the FAA inspector's report is any reference to consultation in or concerning the execution process itself.

Instead, it is clear that the FAA inspectors exercised significant discretion that they were not authorized to exercise. They determined which blades and vanes had "questionable cert documents," which means that they were driving the decision about what was questionable, the essence of discretion.  Effectively, the FAA inspectors themselves executed the government's search warrant, thereby eviscerating the requirement that the warrant be executed by an "Authorized Officer."

In sum, the critical role of the FAA inspectors in the execution of this search warrant renders the search unconstitutional.  Consequently, the seizures, and their fruit, must be suppressed.  See Wong Sun v. United States, 371 U.S. 471 (1963).  At very least the Court should hold an evidentiary hearing to flesh out the circumstances of how the search was conducted.

**F.**     <u>**Failure to Include Protocols for Search of Electronic Media**</u>

In addition to the constitutional violations delineated above related to the execution of the government's search warrant, the government also failed to establish protocols for searching the contents of computers seized during their July 2009 search.  This unconstitutional omission, too, warrants the suppression of the fruits of the government's search.

Recent decisions make clear that the government's failure to establish protocols for searching seized computers taints the government's investigation and requires dismissal of any ensuing charges:

> In addressing searches for hard copy documents and seizures of telephone communications, the Supreme Court has admonished that "responsible officials, <u>including judicial officers</u>, must take care to assure that [searches] are conducted in a manner that minimizes unwarranted intrusion upon privacy." <u>Andresen</u>, 427 U.S. at 482 n. 11 (emphasis added). That admonition applies with even more force in the context of computer searches, where the volume of intermingled documents may be substantial and there are tools to focus those searches that are unavailable for searches of hard copy documents.  We conclude that, as a practical matter, the government can provide the Court with a protocol that would supply particularity to the search of the computers. And, we conclude that as a matter of constitutional law, the government must do so in order to satisfy the particularity requirement of the Fourth Amendment.

<u>In re Search of 3817 W. W. End, First Floor Chicago, Illinois 60621</u>, 321 F. Supp. 2d 953, 960-61 (N.D. Ill. 2004).  <u>See</u> <u>also</u> <u>United States v. Hill</u>, 459 F.3d 966, 976 (9th Cir. 2006) ("We do not approve of issuing warrants authorizing blanket removal of all computer storage media for later examination when there is no affidavit giving a reasonable explanation ... as to why a wholesale seizure is necessary."); <u>United States v. Phua</u>, 2015 U.S. Dist. LEXIS 47401, at *20 (D. Nev. Mar. 20, 2015) (denying application for search warrants because they did not contain an appropriate protocol delineating procedures to be followed to address Fourth Amendment issues, including the "methods and procedures that will locate and expose those categories of files, documents, and other electronically stored information that are identified with particularity in the warrant, while

minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable"). The need for such protocols is consistent with the U.S. Department of Justice's own recommendations. See U.S. Dep't of Justice, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations 43, 69 (July 2002) (recommending that "if agents expect that they may need to seize a personal computer and search it off-site to recover the relevant evidence, the affidavit should explain this expectation and its basis to the magistrate judge. The affidavit should inform the court of the practical limitations of conducting an on-site search, and should articulate the plan to remove the entire computer from the site if it becomes necessary."). Here, as well, in the absence of protocols for searching computers seized from Tara Technology's offices, all of the seized digital evidence must be suppressed.

### G.   Unsupervised Informant

From January 2009 on, it became clear from the FAA's own notes that the Tara Technology employee who "tipped" the FAA to an issue was, in reality, serving as the government's agent. The FAA directed him to do things and he acted in accordance with the instructions he received. See, e.g., Ex. F (FAA Activity Log at 2/4/09 ("[An OIG Supervisor] ASKED US TO TRY TO OBTAIN A PURCHASE ORDER FROM TARA .... I CALLED THE CONTACT AT TARA TO SEE IF HE WOULD BE ABLE TO GET THESE DOCUMENTS FOR US.")). With that relationship came a corresponding responsibility: the government was obligated to alert the informant that he should not be seizing documents or trying to intercept the communications of the subjects of the investigation, including their attorney-client communications. The government did not fulfill that responsibility. Instead, the government deliberately used the informant as an agent to intercept documents and provide them to the government without a warrant. Id.

Such conduct is unconstitutional, even if the government did not actively precipitate the informant's activities. See United States v. McAllister, 18 F.3d 1412, 1417 (7th Cir. 1994)

(recognizing that a confidential informant may be acting as a government agent and be subject to the Fourth Amendment's limitations when "the government knew of and acquiesced in the intrusive conduct" and "the private party's purpose ... was to assist law enforcement efforts or to further his own ends"). Consequently, the Court must dismiss the Indictment.

## VIII.    THE COURT SHOULD GRANT A BILL OF PARTICULARS TO CLARIFY CERTAIN VAGUE ALLEGATIONS IN THE INDICTMENT.

Federal Rule of Criminal Procedure 7(f) provides that a court may direct the government to provide an accused with a bill of particulars when necessary to clarify vague allegations contained in the charging instrument.  The purpose of a bill of particulars is to supplement an indictment, thereby enabling a criminal defendant to adequately prepare his defense, to avoid unfair surprise at trial, and to protect himself against a second prosecution for an inadequately described offense.  United States v. Adams, 759 F.2d 1099, 1113 (3d Cir. 1985); United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971).  See also United States v. Bortnovsky, 820 F.2d 572, 575 (2d Cir. 1987) (holding that district court erred in refusing to grant bill of particulars which was vital to defendants' understanding of charges against them and to their preparation of a defense).  If a defendant seeks legitimate information, his request for a bill of particulars may not be denied merely because providing the missing information would divulge details of the government's evidence or because the indictment is in other respects sufficiently detailed.  Addonizio, 451 F.2d at 64 n.16.  In this regard, the granting of bills of particulars is particularly appropriate given that Rule 7(f) was specifically amended "to encourage a more liberal attitude by courts towards bills of particulars."  United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989) (bills of particulars required "whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial").

Here, the Indictment contains several vague allegations that force Defendant Vaisman to guess regarding important aspects of the criminal conduct charged by the government.  Because Defendant Vaisman's requests, discussed <u>seriatim</u> below, seek "only the minimum amount of information necessary to permit the defendant to conduct his own investigation" of the charges posed against him, <u>United States v. Smith</u>, 776 F.2d 1104, 1111 (3d Cir. 1985), they should be granted.

**A.     The Court Should Grant a Bill of Particulars Requiring the Government to List the Parts that Were Involved in an Alleged "Sham Transactions" and Which Were the Subject of an Alleged False Certification, as well as the Identity of the Alleged Victims.**

Count One of the Indictment alleges a multi-faceted conspiracy in which part of the conspiracy was (1) to provide repair stations with fraudulent so-called Shelby Certifications and Tara Aviation Certifications (which included an alleged misrepresentation that the parts had not been exposed to excessive stress or heat), and (2) "It was further part of the conspiracy that ... defendant VAISMAN and his conspirators would orchestrate sham transactions, which occurred only on paper and typically simultaneously, between Tara Aviation and F.S.I. for the sole purpose of creating Part 145 trace paperwork," Indictment, Count One ¶ 12-13. Counts Two through Fourteen allege substantive mail and wire fraud violations but fail to identify, with respect to each count, what type of fraud was committed (<u>i.e.</u>, false certifications or sham transactions).  Similarly, Count Fifteen of the Indictment charges a substantive violation of 18 U.S.C. § 38(a)(3), which prohibits conspiring to "falsif[y] or conceal[] a material fact concerning any aircraft ... part," contrary to 18 U.S.C. § 38(a)(1)(A), premised upon the alleged "concealment and removal by grit-blasting, blending and related methods of indicia of prior rejections by FAA Repair Stations and other potential visible defects on the aircraft parts, and the use of fraudulent and misleading trace paperwork." The same allegation regarding "illegal" grit blasting and use of trace paperwork is

included in the Count One conspiracy charge. See Indictment, Count One ¶ 4, 6-7. The Indictment also alleges that some (but not all) parts had been rejected by FAA repair stations. Id. Count One ¶¶ 10, 11. The Indictment fails, however, to identify the specific parts that had been rejected by FAA repair stations, grit blasted or with respect to which Defendant Vaisman is alleged to have used false trace paperwork or which were involved in an alleged sham transactions; the Indictment also fails to indicate which type of fraud was involved in the substantive mail and wire fraud counts. The government should be ordered to give the defense those details in in a bill of particulars.

Despite the allegation in the Indictment of multiple types of alleged wrongdoing relating to aircraft parts, the government fails to identify which specific parts were included in each aspect of the alleged conspiracy and fails to allege what fraud was committed with respect to each substantive mail and wire fraud count.  Indeed, the Indictment does not identify even a single part; rather, it lumps them all together, and provides on detail in the substantive mail and wire fraud counts as to the fraud committed with respect to each alleged violation, leaving Defendant Vaisman to guess which parts were involved in which of the alleged wrongful conduct, and impossible task given that Defendant Vaisman was involved in brokering the sale of thousands of aircraft parts during the years in question.

A criminal defendant cannot be compelled to guess at the criminal conduct with which he has been charged.  See United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988) (reversing conviction where government failed to provide defendant prior to trial with particulars of specific companies he was charged in indictment with having extorted); Bortnovsky, 820 F.2d at 574-75 ("We conclude that appellants were hindered in preparing their defense by the district court's failure to compel the Government to reveal crucial information ... Appellants were forced to

explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending.  In effect, the burden of proof impermissibly was shifted to appellants.").  Yet, in the absence of information identifying the specific parts that allegedly were grit blasted, and the specific parts with respect to which allegedly false trace paperwork was used, and the specific parts that were involved in alleged sham transactions, Defendant Vaisman will be forced to guess at which parts the government believes were handled unlawfully and, hence, defense counsel will be unable to fully prepare a defense in advance of trial.  See Hsia, 24 F. Supp.2d at 32 (ordering "a bill of particulars disclosing how Ms. Hsia is alleged to have caused each of the false statements to be made"); United States v. Cole, 717 F. Supp. 309, 316-17 (E.D. Pa. 1989) (directing government to particularize allegations in indictment to inform defendant of precise unlawful conduct charged against him); United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1389 (W.D. Pa. 1983) (directing the government to identify which of 150 contracts bid upon were alleged to be the subject of conspiracy charge).

In like circumstances – e.g., a complex case involving a complicated regulatory scheme, multi-faceted wrongdoing alleged in the Indictment, multi-year period of alleged misconduct, tens of thousands pages of discovery (but no witness statements) – federal courts have required the government to provide additional information in a bill of particulars so that defense counsel could prepare a defense:

> .... In considering whether to require a bill of particulars, the court may consider the complexity of the charges, the clarity of the indictment, and the degree of discovery available to the defense absent a bill of particulars.
>
> The charges in this case are complex. Defendant, a practicing physician, is charged with seven counts of mail fraud in violation of 18 U.S.C. § 1341 and eighteen counts of health care fraud in violation of 18 U.S.C. § 1347. He is alleged to have conducted a scheme that involved ordering medically unnecessary tests for patients, making the patients believe they needed the tests, making false entries in the patients' records to

justify the tests, and submitting over $400,000 in fraudulent bills to insurance companies. The scheme is claimed to have covered a period of three and one-half years.

The indictment identifies a wide variety of types of allegedly unnecessary tests that defendant ordered, including ultrasounds, thyroid tests, heart tests, chest x-rays, and nerve conduction tests. It describes these only in generic terms, however; there is no specification of the particular tests claimed to be unnecessary. The indictment also identifies certain bills claimed to be false which were sent in furtherance of the scheme. It does not purport, however, to identify the entire universe of false billings, nor does it identify the patients claimed to have been subjected to unnecessary tests (except to the extent they are identified in the handful of false billings listed in the indictment).

The government has produced some 17,000 pages of documents to defendant. It has also provided early disclosure of witness statements made in the course of its investigation, as well as charts summarizing insurance data. It has described, at least in outline form, its theory of the case. And it has provided, or will provide, reports from experts who evidently will testify concerning the medical necessity for the tests that defendant allegedly ordered.

In view of the amount of early pretrial discovery that has been provided beyond the requirements of Rule 16 (namely the witness statements and charts), most of defendant's requests go beyond what is necessary and appropriate. However, the Court believes that defendant is entitled to know prior to trial certain basic matters: the identity of the patient-victims of the alleged offenses, the records claimed to include false entries, and any allegedly fraudulent bills to insurers. The defense should not be left to its own devices and a sifting of the voluminous materials that have been provided in order to divine the particulars of these critical allegations, which have not yet been disclosed.

United States v. Vasquez-Ruiz, 136 F. Supp. 2d 941, 942-43 (N.D. Ill. 2001) (emphasis added)

(internal citations omitted but citing, inter alia, Bortnovsky, 820 F.2d at 575 ("The Government

did not fulfill its obligation [to inform defendants of the charges] merely by providing mountains

of documents to defense counsel who were left unguided as to which documents would be proven

falsified or which of some fifteen burglaries would be demonstrated to be staged.").  Here, as well,

the government should be required to correlate specific aircraft parts with the particular theories

alleged in the Indictment and correlate specific types of fraud (i.e., false certification or sham transaction) with respect to each substantive mail and wire fraud count.

The government also should be required to identify the victims of the alleged fraudulent conduct. Specifically, Count One of the Indictment alleges that the victims of the alleged fraudulent scheme were as follows:

> l.T.R.T., A.L., J.I., A.l.S.C., I.A., A.A., J.E.M., and A.T.H. were victim aircraft operators or aircraft parts purchasers who, along with other victims, purchased aircraft parts in reliance on the fraudulent misrepresentations and omissions described below.

Indictment, Count One ¶ 1.e. The actual identity of all of the victims is critical because, for example, the Indictment alleges that "FAA Repair Stations used trace paperwork to determine whether the aircraft part was repairable," id. ¶ 2(h), but repairs stations are not "aircraft operators or aircraft parts purchasers," and it is unclear whether Defendant Vaisman must defend the case with the expectation that repair stations will be held out by the government as "victims."  Indeed, even though repair stations do not purchase parts, Count One of the Indictment later alleges that Defendant agreed with "others to devise a scheme and artifice to defraud aircraft operators, aircraft parts purchasers, FAA Repair Stations, and others." Indictment, Count One ¶ 3. Similarly, the Indictment charges that only some (but not all) alleged victims, considered trace paperwork to be important, see Indictment, Count One ¶ 2(i) ("Some aircraft operators required Part 145 trace paperwork as a condition of purchasing aircraft parts.") & ¶ 12 (... when certain aircraft operators and other customers ... required Part 145 trace paperwork as a prerequisite to purchasing blades and vanes from Tara Aviation ..."), only some (but not all) FAA Repair Stations would have refused to repair parts if they knew that the Shelby Certifications and Tara Aviation Certifications were not based on actual knowledge regarding the part's history, see id. ¶ 10 ("FAA Repair Stations generally would have refused to attempt to repair the Scrapped Parts had they known these

facts."), and only some (but not all) Aircraft operators would have declined to purchase aircraft parts if they knew that the Shelby Certifications and Tara Aviation Certifications were not based on actual knowledge regarding the part's history, see id. ¶ 11 ("Aircraft operators generally would have refused to purchase the aircraft parts and install them on their aircraft had they known these facts.").

Maybe there are no other operators, repair stations or customers whom the government believes were defrauded other than those identified by initials in the Indictment.  But, if the government intends to prove unlawful conduct directed at other victims, or if the conspiracy alleged by the government is alleged to have been directed at others, then the government should be ordered to identify those others, in a bill of particulars, so that defense counsel can prepare a defense. Accordingly, the government should be directed to provide Defendant Vaisman with a bill of particulars identifying every alleged victim and the manner in which they are alleged to have been defrauded. See Davidoff, 845 F.2d at 1155 (holding that even pretrial production of Jencks Act and other discovery material "may not be automatically relied on by the Government as an adequate substitute for a straightforward identification in a bill of particulars of the identity of victims of offenses that the prosecution intends to prove"); Vasquez-Ruiz, 136 F. Supp. 2d at 943 (holding that defendant was "entitled to know prior to trial certain basic matters," including "the identity of the patient-victims of the alleged offenses").

### B. The Court Should Grant A Bill Of Particulars Requiring the Government to Identify the "Others" with Whom Defendant is Alleged to Have Conspired or, in the Alternative, the Court Should Strike the Allegation.

Count One of the Indictment charge that Vaisman conspired with named coconspirators "and others." Indictment, Count One, ¶ 3, ¶¶ 6-7. The Indictments fails, however, to identify those "others" with whom Defendant is alleged to have conspired, and with respect to whom the

government intends to present evidence at trial. Without knowing the identity of these "others" referred to in the Indictment, Defendant will be unable to investigate fully the circumstances of the Indictment, prepare potential objections under Federal Rule of Evidence 801(d)(2)(E), or protect himself against a second prosecution for the same offense, naming different coconspirators.

In similar cases, and for these same reasons, courts have routinely directed the government to provide bills of particulars identifying those "others" with whom a defendant is alleged to have conspired.  See United States v. Vastola, 670 F. Supp. 1244, 1269-70 (D.N.J. 1987) (ordering the government to provide the defendant with the names of all coconspirators or participants in the charged offenses).  See also United States v. Anderson, 31 F. Supp.2d 933, 938 (D. Kan. 1998) (directing the government to disclose the identities of unindicted coconspirators); United States v. Trie, 21 F. Supp.2d 7, 22 (D.D.C. 1998) (same); United States v. Oakar, 924 F. Supp. 232, 246 (D.D.C. 1996) (holding that the defendant is entitled to bill of particulars setting forth identities of unnamed coconspirators), rev'd in part on other grounds, 111 F.3d 146 (D.C. Cir. 1997); United States v. Hsia, 24 F. Supp.2d 14, 31 (D.D.C. 1998) (directing government to identify individuals who performed allegedly unlawful acts on behalf of corporation identified in indictment); United States v. Strawberry, 892 F. Supp. 519, 527 (S.D.N.Y. 1995) (directing the government to provide the defendant with a bill of particulars naming all unnamed coconspirators); United States v. Cutolo, 861 F. Supp. 1142, 1149 (E.D.N.Y. 1994) (directing the government to provide the defendant with bill of particulars identifying "others" alleged in indictment to have conspired with defendant); United States v. Allocco, 801 F. Supp. 1000, 1003 (E.D.N.Y. 1992) (requiring government to provide defendant with bill of particulars listing names of "the others" referred to in indictment), aff'd, 29 F.3d 620 (2d Cir. 1994); United States v. Lonzo, 793 F. Supp. 57, 60 (N.D.N.Y. 1992) (directing government to provide defendant with names of unindicted

coconspirators); United States v. Recognition Equipment, Inc., 711 F. Supp. 1, 10 (D.D.C. 1989) (directing government to identify individuals alleged to have received unlawful gratuities); United States v. McDonnell, 696 F. Supp. 356, 359-60 (N.D. Ill. 1988) (directing the government to provide bill of particulars identifying "the attorney from whom the defendant allegedly accepted the bribes or the name of the case or cases with which that attorney was affiliated," in the absence of which the defendant could "only hazard to guess" at their identity); United States v. Rogers, 617 F. Supp. 1024, 1028-29 (D. Colo. 1985) (holding that government must identify undisclosed and unidentified coconspirators, aiders and abettors, and other individuals involved in the criminal acts charged); United States v. Ahmad, 53 F.R.D. 194, 199 (M.D. Pa. 1971) (directing government to furnish defendant with names and addresses of alleged co-conspirators known to the government).   Accordingly, here as well, the Court should order the government to provide Defendant Vaisman with a bill of particulars identifying the "others" with whom he and his codefendants are alleged to have conspired.

It may well be that the "others" implicated by the government in the alleged conspiracy are limited to those individuals actually named in the Indictment. In that case, the Court should strike the phrase "and others" from the indictment as "surplusage," under Federal Rule of Criminal Procedure 7(d).  Surplusage is language that is not relevant to the crimes charged in the indictment and from which a jury might draw improper inferences.  United States v. Gatto, 746 F. Supp. 432, 455 (D.N.J. 1990), rev'd on other grounds, 924 F.2d 491 (3d Cir. 1991).  See also United States v. Marshall, 985 F.2d 901, 905 (7th Cir. 1993) (explaining that surplusage is language which is immaterial, irrelevant or prejudicial).

Rule 7(d) expressly provides that, upon motion of a defendant, the court may strike such surplusage from an indictment.  See United States v. Poore, 594 F.2d 39, 41 (4th Cir. 1979)

(explaining that the purpose of Rule 7(d) is "to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment, or not essential to the charge, or unnecessary, or inflammatory").  And, where indictments have contained language that is irrelevant to the charges, or inflammatory and prejudicial – like "and others" – courts have not hesitated to strike the excess language.  See, e.g., Gatto, 746 F. Supp. at 457 (striking phrase "and others" as it implied broader scope of illegal activity than alleged in the indictment); Vastola, 670 F. Supp. at 1255 (striking irrelevant, vague language, which may have implied guilt by association or insinuated facts not alleged in the indictment).  See also United States v. McGuire, 744 F.2d 1197, 1206 (6th Cir. 1984) (holding that district court properly deleted surplusage to avoid confusing jury); United States v. Espy, 989 F. Supp. 17, 35 (D.D.C. 1997) (striking phrase "and others"); United States v. Whitehorn, 710 F. Supp. 803, 819 (D.D.C. 1989) (striking surplusage from overt actions section of conspiracy indictment); United States v. Mandel, 415 F. Supp. 997, 1009 (D. Md. 1976) (striking surplusage that had prejudicial potential for confusing jury).

Here, unless clarified by a bill of particulars, the government's allegation that Defendant Vaisman conspired with unspecified "others," is vague and ambiguous, thus prejudicing him not only by impeding his preparation for trial, but also by unfairly suggesting that he engaged in criminal conduct broader than that presented to the grand jury and alleged in the Indictment.  As such, use of the phrase "and others" runs afoul of the admonition that "[a]nything in the indictment that allows the jury to infer involvement with uncharged crimes ... is improper."  Vastola, 670 F. Supp. at 1255.  Accordingly, to the extent the government is unable or unwilling to identify the "others" with whom Defendant Vaisman is alleged to have conspired, the phrase "and others" should be stricken from the indictment.

**C.     The Court Should Grant a Bill Of Particulars to Clarify the Allegation that Defendant Vaisman Conspired in the District Of New Jersey and "Elsewhere" or, in the Alternative, the Court Should Strike the Allegation.**

Count One alleges that the charged conspiracy took place in the District of New Jersey and "elsewhere."  See Indictment, Count One, ¶ 3. Similarly, every substantive count alleges that Defendant Vaisman acted "in the District of New Jersey and elsewhere." See Indictment, Counts 2-10 ¶ 2, Counts 11-14 ¶ 2, Count 15 ¶ 2, Counts 16-19 ¶ 10, Counts 20-23 ¶ 8. The Indictment does not describe where "elsewhere" might be for purposes of the conduct with which Defendant Vaisman has been charged, and which he must therefore defend against.  For example, the tax counts – which allege that Defendant Vaisman subscribed a tax return containing a knowingly false statement – charges that he did so in the District of New Jersey and elsewhere, although presumably Vaisman was sitting in one place when he committed the act of subscribing the referenced tax returns.

A criminal defendant is entitled to know those other places – denominated as "elsewhere" – where conduct set forth in an indictment is alleged by the government to have occurred.  Indeed, under similar circumstances, courts have not hesitated to direct the government to disclose precisely such information when requested by the defense.  See, e.g., United States v. Hickey, 16 F. Supp.2d 223, 245 (E.D.N.Y. 1998) (directing the government to provide a bill of particulars regarding allegation that offense took place within the district and "elsewhere"); United States v. Lonzo, 793 F. Supp. at 59 (same); United States v. Gatto, 746 F. Supp. at 457 (same); United States v. Castellano, 610 F. Supp. 1359, 1389 (S.D.N.Y. 1985) (same); United States v. Thevis, 474 F. Supp. 117, 127 (N.D. Ga. 1979)  ("the defendant in the alleged conspiracy is entitled to know where the government contends the illegal agreement was made"), aff'd, 665 F.2d 616 (5th Cir. 1982).

It may be that the alleged conspiracy, and the other unlawful acts charged by the government, are limited to the District of New Jersey.  In that event, the term "elsewhere" should be stricken as surplusage, for the same reasons set forth above.  See Gatto, 746 F. Supp. at 457-58 (striking term "elsewhere" from indictment).  If, however, the government intends to prove that alleged conduct occurred "elsewhere," that is, in some other geographic location, the government properly should be directed to disclose such locations to the defense.

## CONCLUSION

For these reasons, the Court should enter an order dismissing the Indictment and/or granting the other relief requested above.

Respectfully submitted,

Mark A. Berman, Esq.
Jeremy B. Stein, Esq.
**HARTMANN DOHERTY ROSA**
**BERMAN & BULBULIA, LLC**
65 Route 4 East
River Edge, NJ 07661
(201) 441-9056
mberman@hdrbb.com

*Attorneys for Defendant*
*Gideon Vaisman*

Dated: May 2, 2016