UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA      :      Hon. Mary L. Cooper

v.      :      Crim. No. 15-348 (MLC)

GIDEON VAISMAN      :

---

BRIEF OF THE UNITED STATES IN OPPOSITION TO
DEFENDANT GIDEON VAISMAN'S PRETRIAL MOTIONS

---

PAUL J. FISHMAN
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

ANDREW KOGAN
Assistant U.S. Attorney

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY................................. 4

  1.  The Federal Aviation Administration Regulatory Framework................... 4

  2.  Vaisman's Fraudulent Activity ........................................................ 6

  3.  Vaisman's Filing of False Tax Returns................................................ 12

LEGAL ARGUMENT.............................................................................. 14

  1.  THE COURT SHOULD DENY VAISMAN'S MOTIONS TO DISMISS THE INDICMENT ........................................................................ 14

    A.  Motions to Dismiss Are Rarely Granted. ......................................... 14

    B.  The Mail and Wire Fraud Counts Properly Allege and Demonstrate a Deprivation of Property ............................................................ 15

    C.  The Mail and Wire Fraud Counts Properly Allege a Scheme and Artifice to Defraud and State Material Misrepresentations and Omissions.............................................................................. 19

    D.  The Tax Counts Properly Allege the Charged Offense....................... 22

    E.  The Title 26, United States Code, Section 7206(1) Charges are not Vague as Applied to Vaisman and Properly Allege Willfulness.......... 24

    F.  There are no Statute of Limitations Violations. ................................ 28

  2.  THE COURT SHOULD NOT SUPPPRESS EVIDENCE OBTAINED DURING AUTHORIZED, PROPERLY EXECUTED, SEARCHES .............. 31

    A.  Background ............................................................................... 31

    B.  Standing.................................................................................... 33

    C.  There Were No Unconstitutional Searches....................................... 35

    D.  There were no False Allegations in the Search Warrant Affidavits. ... 39

    E.  The 2009 Search Warrant was not a General Search Warrant ......... 42

F.  Law Enforcement Properly Executed the 2009 Search Warrant ....... 45

G.  The 2009 Search Warrant Affidavit Included Protocols for the Review of Electronic Media ......................................................................... 46

3.  THERE IS NO NEED FOR A BILL OF PARTICULARS ........................... 47

CONCLUSION ............................................................................................. 54

# Table of Authorities

Cases

Andresen v. Maryland,
   427 U.S. 463 (1976) ................................................................ 42

Franks v. Delaware,
   438 U.S. 154 (1978) .......................................................... 36, 39

Grenada Industries v. C.I.R.,
   17 T.C. 231 (1951) ................................................................. 23

Maynard v. Cartwright,
   486 U.S. 356 (1988) ............................................................... 24

McNally v. United States,
   483 U.S. 350 (1987) ............................................................... 18

Minnesota v. Carter,
   525 U.S. 83 (1998) ................................................................. 33

Murray v. United States,
   487 U.S. 533 (1988) ............................................................... 36

New York v. Burger,
   482 U.S. 691 (1987) ............................................................... 33

Rose v. Locke,
   423 U.S. 48 (1975) ................................................................. 24

United States v. Addonizio,
   451 F.2d 49 (3d Cir. 1971) ........................................... 47, 48, 52

United States v. Bergrin,
   650 F.3d 257 (3d Cir. 2011) ..................................................... 14

United States v. Boffa,
   513 F. Supp. 444, 485 (D. Del.), aff'd in part, rev'd in part on other grounds,
   688 F.2d 919 (3d Cir. 1983) ............................................... 48, 50

United States v. Britt,
   508 F.2d 1052 (5th Cir. 1975) ................................................. 34

United States v. Buchanan,
   904 F.2d 349 (6th Cir. 1990) ................................................... 36

United States v. Calisto,
    838 F.2d 711 (3d Cir. 1988) ................................................................. 36, 39

United States v. Carter,
    530 F. App'x 199 (3d Cir. July 16, 2013) ..................................................... 36

United States v. Caruso,
    948 F. Supp. 382 (D.N.J. 1996) ........................................................... 48, 52

United States v. Christine,
    687 F.2d 749 (3d Cir. 1982) .................................................................... 43

United States v. Chuang,
    897 F.2d 646 (2d Cir. 1990) .................................................................... 34

United States v. Conley,
    4 F.3d 1200 (3d Cir. 1993) ...................................................................... 43

United States v. Coyle,
    63 F.3d 1239 (3d Cir. 1995) .................................................................... 19

United States v. DeLaurentis,
    230 F.3d 659 (3d Cir. 2000) .................................................................... 14

United States v. Delle Donna,
    552 F. Supp. 2d 475 (D.N.J. 2008) ........................................................... 50

United States v. Eisenberg,
    773 F. Supp. 662 (D.N.J. 1991) ............................................................... 50

United States v. Giampa,
    904 F. Supp. 235 (D.N.J. 1995) ............................................................... 50

United States v. Hager,
    721 F.3d 167 (4th Cir. 2013) ................................................................... 24

United States v. Henry,
    29 F.3d 112 (3d Cir. 1994) ...................................................................... 17

United States v. Herrold,
    962 F.2d 1131 (3d Cir. 1992) .................................................................. 36

United States v. Huet,
    665 F.3d 588 (3d Cir. 2012) ............................................................... 14, 15

United States v. Johnson,
    690 F.2d 60 (3d Cir. 1982) ........................................................ 36

United States v. Leary,
    846 F.2d 592 (10th Cir. 1988) .................................................. 44

United States v. Mallas,
    762 F.2d 361 (4th Cir. 1985) .................................................... 26

United States v. Mariani,
    7 F. Supp. 2d 556 (M.D. Penn. 1998) ....................... 48, 49, 50, 52

United States v. Miller,
    800 F.2d 129 (7th Cir. 1986) .................................................... 38

United States v. Mohney,
    949 F.2d 1397 (6th Cir. 1991) .................................................. 34

United States v. Moyer,
    674 F.3d 192 (3d Cir. 2012) ...................................................... 24

United States v. Novak,
    443 F.3d 150 (2d Cir. 2006) ...................................................... 18

United States v. Panarella,
    277 F.3d 678 (3d Cir. 2002) ...................................................... 14

United States v. Parlavecchio,
    903 F. Supp. 788 (D.N.J. 1995) ................................................ 50

United States v. Pearlstein,
    576 F.2d 531 (3d Cir. 1978) ...................................................... 19

United States v. Rosa,
    891 F.2d 1063 (3d Cir. 1989) .............................................. 47, 48

United States v. Sadler,
    750 F.3d 585 (6th Cir. 2014) .................................................... 18

United States v. SDI Future Health, Inc.,
    568 F.3d 684 (9th Cir. 2009) .................................................... 34

United States v. Shellef,
    507 F.3d 82 (2d Cir. 2007) ........................................................ 18

v

United States v. Smith,
   776 F.2d 1104 (3d Cir. 1985) ....................................................... 48

United States v. Sourlis,
   953 F. Supp. 568 (D.N.J. 1996)............................................... 48, 49

United States v. Starr,
   816 F.2d 94 (2d Cir. 1987) ......................................................... 18

United States v. Stearn,
   597 F.3d 540 (3d Cir. 2010) ....................................................... 33

United States v. Tracey,
   597 F.3d 140 (3d Cir. 2010) ....................................................... 43

United States v. Vasey,
   834 F.2d 782 (9th Cir. 1987) ...................................................... 36

United States v. Wabo,
   290 F. Supp. 2d 486 (D.N.J. 2003) ............................................ 49

United States v. Yusuf,
   461 F.3d 374 (3d Cir. 2006) ....................................................... 43

United States v. Zauber,
   857 F.2d 137 (3d Cir. 1988) ...................................................... 18

United States v. Zipperstein,
   601 F.2d 281 (7th Cir. 1979)...................................................... 38

United States v. Zolp,
   659 F. Supp. 692 (D.N.J. 1987)............................................... 48, 49

Statutes

18 U.S.C. § 3105 ............................................................................ 45

18 U.S.C. § 3282(a) ....................................................................... 28

18 U.S.C. § 3292.................................................................... 29, 30

26 U.S.C. § 7206(1) ................................................................ passim

**Rules**

Fed. R. Crim. P. 7(f) ................................................................ 47, 48

**Regulations**

14 C.F.R. § 43.9(a) .................................................................. 20

## PRELIMINARY STATEMENT

The United States submits this memorandum of law in response to the pretrial motions filed by defendant Gideon Vaisman ("Vaisman").

The Indictment alleges (Counts 1 and 15) that Vaisman engaged in a multi-year conspiracy to defraud aircraft operators, aircraft parts purchasers, Federal Aviation Administration ("FAA") Repair Stations, and others by using fraudulent and misleading trace paperwork, as well as other misrepresentations, concealments, and omissions, in order to sell airplane parts for significant profits. Vaisman engaged in this activity through companies that he and his conspirators controlled. The Indictment also alleges that Vaisman committed numerous substantive acts of wire and mail fraud as part of this conspiracy (Counts 2-14). The Indictment further alleges that Vaisman knowingly filed personal tax returns that failed to include income from a company he controlled (Counts 16-19) and caused to be filed S Corporation tax returns knowing they did not include the full income earned by that entity (Counts 20-23).

In his motions, Vaisman initially argues that the conspiracy counts and substantive wire and mail fraud counts should be dismissed as they fail to allege a scheme to defraud, fail to allege false statements or material omissions, and fail to allege a deprivation of property. The charges, though, are set forth in a detailed Indictment that contains legal and factual allegations that are more than sufficient to establish the elements of each offense. Indeed, the Indictment

1

contains numerous allegations describing how Vaisman acted deceitfully to execute his scheme and conceal the history of the airplane parts he was selling for significant profits. To the extent Vaisman challenges factual allegations in the Indictment or attempts to diminish their significance, such arguments must be addressed to a jury and are premature in a pretrial motion to dismiss.

Vaisman next alleges that the tax charges must be dismissed as they fail to allege an intent to evade tax and the statute is void for vagueness as applied. First, similar to the fraud charges, the charges are set forth in a detailed Indictment that contains factual allegations that are more than sufficient to establish the elements of each offense. Further, contrary to Vaisman's wishes, the elements of the charged offense do not include an intent to evade taxes. Moreover, Vaisman committed his acts willfully in failing to include on the returns income that a company he owned made as well as amounts that the company spent on purchases (artwork and a harp) for his personal use. Thus, the statute is not vague as applied.

Vaisman also argues that the fraud and tax charges must all be dismissed claiming they are barred by the statute of limitations. To the contrary, however, the charges were brought within the statute of limitations when taking into account time excluded based upon MLATs to foreign entities and time that Vaisman himself agreed to exclude.

Vaisman next argues that the government engaged in unconstitutional searches warranting dismissal of the Indictment and that evidence obtained

during court-authorized searches must be suppressed. Initially, the Government did not engage in unconstitutional searches. Second, the government properly applied for, received, and executed the two court-authorized search warrants in this matter. Thus, the Court should deny Vaisman's motions on this ground.

Lastly, Vaisman seeks a bill of particulars. The Indictment and discovery in this matter provide Vaisman with the ability to prepare his defense, not be subject to surprise at trial, and protect himself from a second prosecution for the same offenses. There is therefore no need for a bill of particulars and Vaisman's motion should be denied.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

From as early as 1990 through July 2009, Vaisman engaged in a conspiracy to obtain money and property by defrauding others, including aircraft parts purchasers, concerning aircraft parts. Vaisman also filed false and fraudulent personal tax returns for tax years 2009 through 2013 by omitting the income of Tara Aviation, Ltd. ("Tara Aviation"), a company he owned, and omitting amounts spent by Tara Aviation to purchase artwork and a harp for Vaisman's personal use. Vaisman further committed criminal acts in 2006 through 2009 by filing and causing to be filed false S Corporation tax returns for Tara Technology, a second company Vaisman owned.

1.    The Federal Aviation Administration Regulatory Framework

The FAA is part of the United States Department of Transportation and has the responsibility for the advancement, safety, and regulation of air travel in the United States. Indictment, Count 1 ¶ 2(a). This regulatory authority includes certifying those individuals who repair aircraft and aircraft accessories, as well as ensuring the safety and integrity of aircraft parts. Indictment, Count 1 ¶ 2(a). In the United States, aircraft owners, including commercial airline companies, obtain replacement aircraft parts either directly from the manufacturer or from one of several intermediate sources, including aircraft parts brokers. Indictment, Count 1 ¶ 2(b). Before a replacement aircraft part can be installed on an aircraft operating in the United States, that part

4

first has to be inspected and certified as "airworthy." Indictment, Count 1 ¶ 2(b).

The FAA certifies private repair stations ("FAA Repair Stations") to perform inspections and repairs of aircraft parts, and to certify the airworthiness of those parts. Indictment, Count 1 ¶ 2(c). FAA Repair Stations typically require background information about a part and use that information in the process of certifying the part. FAA Repair Stations document their inspections, repairs, and certifications of aircraft parts on FAA Forms 8130-3, also called "Airworthiness Approval Tags." Indictment, Count 1 ¶ 2(d).

FAA regulations proscribe the "grit-blasting" (i.e., industrial sanding), "blending" (i.e., filing), repair, overhaul, alteration, or maintenance of an aircraft part by anyone other than a FAA Repair Station or certificated mechanic. Indictment, Count 1 ¶ 2(e). FAA regulations also require that maintenance or alteration of an aircraft part be documented in the maintenance records for that aircraft part. Indictment, Count 1 ¶ 2(e). Thus, the FAA regulations attempt to insure that the FAA, certified Repair Stations, and ultimate purchasers of replacement airplane parts are able to buy and use airplane parts with knowledge of the history and airworthiness of the part.

Historical or "trace" paperwork generally document the history of an aircraft part and include information such as the part's manufacturer, the aircraft on which the part was used, and how the part was used. Indictment, Count 1 ¶ 2(g). Trace paperwork includes documents known as "material

5

certifications," where the seller of the aircraft parts makes certain representations about the source and quality of the part, including whether an aircraft part had been overhauled or repaired, or had been subjected to severe stress or heat as would occur during a major engine failure, accident, or fire. Indictment, Count 1 ¶ 2(g).

Significantly, aircraft operators use trace paperwork associated with an aircraft part to determine whether to purchase the aircraft part and install it on their aircraft. Indictment, Count 1 ¶ 2(h). Further, FAA Repair Stations use trace paperwork to determine whether they will accept and conduct repairs on the part. Indictment, Count 1 ¶ 2(h).

"Part 145" trace paperwork is historical paperwork tracing an aircraft part's ownership to a certified FAA Repair Station and is used to further establish the integrity of the part. Indictment, Count 1 ¶ 2(i). As explained below, some aircraft operators required Part 145 trace paperwork as a condition of purchasing aircraft parts. Indictment, Count 1 ¶ 2(i).

The FAA does not regulate scrapyards and similar entities because it deems scrapped aircraft parts as permanently removed from commerce, and scrapyards are not part of the aviation industry. Indictment, Count 1 ¶ 2(f).

2.   Vaisman's Fraudulent Activity

Vaisman was the owner and president of Integrated Technology Corporation ("ITC") from approximately 1989 through approximately 1998. During that time, ITC was located in Ridgefield, New Jersey, and was in the

6

business of buying and selling aircraft parts. Indictment, Count 1 ¶ 1(f). In approximately 1998, Vaisman sold ITC. Indictment, Count 1 ¶ 1(f).

At or about that same time, Vaisman created and formed Tara Technology Corporation ("Tara Technology"). Indictment, Count 1 ¶ 1(g)(i). Tara Technology was in the business of manufacturing, buying, and selling aircraft parts. Indictment, Count 1 ¶ 1(g)(i). Vaisman was the owner and president of Tara Technology and controlled Tara Technology, which was also located in Ridgefield, New Jersey. Indictment, Count 1 ¶ 1(g)(ii).

Vaisman also controlled and effectively owned Tara Aviation. Indictment, Count 1 ¶ 1(h)(iii). Tara Aviation was in the business of buying and selling aircraft parts. Indictment, Count 1 ¶ 1(h)(i). While another individual ("Individual #1") was the purported owner of Tara Aviation, records and witness statements reveal that Vaisman was the actual owner and of Tara Aviation. Indictment, Count 1 ¶ 1(h)(i) – (ii). Indeed, Vaisman financed Tara Aviation, had authority over its inventory and cash flow, operated Tara Aviation out of Tara Technology's office in Ridgefield New Jersey (including the storing of inventory), and caused some Tara Technology employees to spend the majority of their time working on Tara Aviation matters. Indictment, Count 1 ¶ 1(h)(iii).

Vaisman used ITC, Tara Aviation, and Tara Technology to engage in a pattern of fraudulent acts. Specifically, Vaisman caused ITC and Tara Aviation to directly or indirectly purchase jet turbine engine parts called "blades" and "vanes." Indictment, Count 1 ¶ 5. These parts, though, were not purchased

from certified FAA repair stations. Instead, and in order to perpetrate his fraud and realize significant illegal profits, Vaisman would cause these parts ("the Scrapped Parts") to be purchased from scrap metal dealers. Indictment, Count 1 ¶ 5. Vaisman then caused others to illegally clean, grit-blast, and/or blend the Scrapped Parts. Indictment, Count 1 ¶ 6. Vaisman took these actions in part to deceive FAA certified repair stations and others and conceal that the Scrapped Parts has been scrapped, damaged, broken, and/or rejected for repair. Indictment, Count 1 ¶ 6.

Vaisman also caused sham sales of the Scrapped Parts in order to create fraudulent or misleading trace paperwork and thus increase the value of the Scrapped Part. Indictment, Count 1 ¶ 7. Specifically, the Scrapped Parts, because of how they were obtained and their purchase condition, did not have trace paperwork. Vaisman knew, though, that Repair Stations and many end use purchasers would require trace paperwork. Hence, to be able to trick others and realize significant profits, Vaisman caused companies he controlled to create trace paperwork although Vaisman and his companies knew they lacked actual knowledge of the Scrapped Parts' history.

Vaisman then caused the Scrapped Parts and the fraudulent trace paperwork certifications to be shipped to FAA Repair Stations. Indictment, Count 1 ¶ 10. Notably, Vaisman and his conspirators intentionally did not provide information or paperwork to the FAA Repair Station that showed the true history of the Scrapped Part -- where it was obtained from and the work

8

Shelby, Tara Technology, or others did -- on the Scrapped Part. Indictment, Count 1 ¶ 10. This caused Repair Stations, which would have acted differently if they knew the history of the Scrapped Part, including rejecting the Scrapped Part, to attempt to repair and then certify the Scrapped Part.

Once the FAA Repair Station performed its work, and if it certified the Scrapped Part, Vaisman caused the sale of the Scrapped Part. Similar to the FAA Repair Station, Vaisman made sure that the true history of the part was concealed from the purchaser as he knew the truth would prohibit the sale of the Scrapped Part at the inflated price.

A look at how this worked provides the roadmap to and reason for Vaisman's criminal activity. As an example, Vaisman would cause Shelby Enterprises ("Shelby"), a company owned and operated by Vaisman's conspirator Carmine "Chuck" Coviello, to purchase a Scrapped Part. Shelby would then work on the part, for instance by grit-blasting the part, make it look presentable, and sell the part to Tara Aviation. As part of this sale, Vaisman would cause Coviello to prepare trace paperwork that certified that the part had "not been subjected to excessive stress or heat that an FAA overhaul facility would deem to be unsuitable for return to service after appropriate inspection." The conspirators prepared this paperwork knowing that they did not know the complete history of the part, knowing that Shelby worked on the part and was not revealing that work, knowing where the part was obtained from, and knowing that they would use manufactured paperwork

9

and certification to deceive others and obtain profits. Vaisman then did just that – provided the part and fraudulent paperwork to a FAA Repair Station, who would have either not accepted the part or inspected it differently if Vaisman and his conspirators had not acted deceitfully. Once the FAA Repair Station certified the part Vaisman sold the Scrapped Part through fraudulent actions, again not revealing the true history of the part and misrepresenting his knowledge of the history of the part, and reaped substantial profits.

Perhaps Vaisman's most blatant fraudulent acts concerned Part 145 trace paperwork and FSI, a company in which Vaisman had a forty-nine percent interest. On numerous occasions aircraft operators or other entities insisted on receiving Part 145 trace paperwork as a condition of purchasing a Scrapped Part from Tara Aviation. This paperwork included information demonstrating that it was previously part of a FAA certified Repair Station's inventory. Tracing the part to a FAA certified Repair Station enabled a prospective purchaser to further determine the integrity of the Scrapped Part.

Because Tara Aviation often did not have Part 145 trace paperwork due to the manner in which it obtained a Scrapped Part (from a scrap yard not a FAA certified Repair Station), Vaisman orchestrated sham transactions to defraud the purchasers. Specifically, Vaisman caused Tara Aviation, on paper, to sell the part to FSI for a nominal price. Simultaneously FSI, which Vaisman was a forty-nine percent owner of, would sell the part back to Tara Aviation at a higher price or in exchange for another benefit. Even though the part never

10

left Tara Technology (which was essentially the same company as Tara Aviation) and was never truly owned by FSI, FSI would provide Part 145 trace paperwork to Tara Aviation stating that the Scrapped Part was part of its stock. Tara Aviation then provided the Part 145 trace paperwork to the purchaser. This paperwork, though, was fraudulent in that the Scrapped Part was never actually part of FSI's stock and FSI never established the integrity of the Scrapped Part. Thus, Vaisman tricked the buyer into paying a significant amount for a Scrapped Part while believing it was purchasing a legitimate part with legitimate Part 145 trace paperwork.

For instance, on or about April 9, 2013, Tara Technology's office manager sent a package to FSI. In the package was a hand-written note stating: "[M.M.], We need Material Certs [i.e., Part 145 trace paperwork] for the attached 8130's [i.e., Airworthiness Approval Tags] Can you please forward this request to the [responsible person[?]] Thanks so much for your help. [M.O.]"[1] The Airworthiness Approval Tags that M.O. had attached with the hand-written note were traceable to Tara Technology's inventory of blades and vanes procured through the fraudulent scheme described above. Consequently, it appeared that M.O. was attempting to obtain fraudulent Part 145 paperwork in furtherance of Vaisman's scheme.

On or about May 1, 2013, DOT-OIG monitored a consensually recorded telephone conversation between M.M. and M.O. During that conversation, M.M.

---

[1] M.M was an employee of FSI. M.O was an employee of Tara Technology.

advised M.O. that the parts for which M.O. sought Part 145 paperwork were not in fact parts owned at any time by FSI, which meant that FSI could not truthfully issue Part 145 paperwork claiming former ownership of the parts. In response, M.O. passed the telephone to Vaisman. M.M. then advised defendant Vaisman, more than once, that FSI never owned the parts, but that FSI was nevertheless willing to provide the Part 145 paperwork, so long as Vaisman understood they were not FSI's parts. In response, Vaisman advised that he understood, and that he wanted the Part 145 paperwork anyway. M.M. thereafter mailed to Tara Technology's offices in Ridgefield the fraudulent paperwork Vaisman had demanded.

3.   <u>Vaisman's Filing of False Tax Returns</u>

Obtaining outrageous profits through fraud was not enough for Vaisman. In the tax years 2006 through 2009 Vaisman effectively owned and controlled both Tara Aviation was Tara Technology. He ran these companies as one – for instance lodging Tara Aviation inventory at Tara Technology's office in New Jersey. Vaisman, though, subscribed personal tax returns that failed to include the income he derived from Tara Aviation on his personal tax returns. He did so clearly knowing of this burden as reported Tara Technology income on the same returns. Further, Vaisman failed to list as income amounts spend by Tara Aviation to purchase artwork and a harp for Vaisman's personal use. Finally, Vaisman caused Tara Technology to file S Corporation Tax Returns that he knew were not true and correct in that the returns failed to include

12

income that Tara Technology earned in the form of Tara Aviation's net earnings.

## **LEGAL ARGUMENT**

1. THE COURT SHOULD DENY VAISMAN'S MOTIONS TO DISMISS THE INDICMENT

    A. Motions to Dismiss Are Rarely Granted.

Vaisman moves to dismiss the Indictment. But only in rare circumstances will an indictment fail to meet that minimal standard to defeat such a motion. Dismissal is appropriate only "if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." United States v. Panarella, 277 F.3d 678, 685 (3d Cir. 2002).

In evaluating such a motion to dismiss, a district court must "adhere to the fundamental principle that . . . a court must accept as true all of the facts alleged." United States v. Huet, 665 F.3d 588, 597 (3d Cir. 2012). A court's review of a motion to dismiss an indictment "is a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury." United States v. Bergrin, 650 F.3d 257, 268 (3d Cir. 2011). That standard is appropriate because "[t]he government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to" Rule 29. United States v. DeLaurentis, 230 F.3d 659, 660-61 (3d Cir. 2000). As a result, the court's ruling "is not . . . a permissible vehicle for addressing the sufficiency of the government's evidence," Bergrin, 650 F.3d at 268 (quotation omitted), and the Court should "limit its inquiry to the four

14

corners of the Indictment" and not consider extrinsic evidence "to discern the Government's theory of the case," Huet, 665 F.3d at 593.

Applying these standards, the Indictment properly tracks the applicable statutory language and stated facts that establish the violations.

> B. The Mail and Wire Fraud Counts Properly Allege and Demonstrate a Deprivation of Property.

The substantive and conspiracy fraud counts properly allege a deprivation of property. Vaisman's lengthy, well-written motion fails as its fundamental assumption is wrong. Specifically, Vaisman alleges there was not deprivation of property because "the purported victims of the charged fraudulent conduct received exactly what they had bargained for . . . ." Defendant's Brief, p. 11. Vaisman doubles up on this claim and concludes his argument by stating that the victims "received exactly what they paid for . . . [t]hus, no victim was deprived of money or property." Defendant's Brief, p. 15.

Although Vaisman may wish for the above to be accurate and attempt to convince himself of such through repetition, nothing could be further from the truth. The Indictment clearly explains how the Repair Stations and end users did not get what they anticipated. First, the Indictment explains how aircraft operators use trace paperwork associated with an aircraft part to determine whether to purchase the aircraft part and install it on their aircraft. Indictment, Count 1 ¶ 2(h). Further, the Indictment explains how FAA Repair Stations use trace paperwork to determine whether to accept a part and conduct repairs on the part. Indictment, Count 1 ¶ 2(h). The Indictment also

15

explains how Vaisman used FSI to create fraudulent Part 145 paperwork to deceive purchasers when the purchasers demanded the paperwork as a condition of the sale. Indictment, Count 1 ¶¶ 12-13. It is beyond dispute that the Indictment alleges the requisite elements, alleges facts proving those elements, and explains how the Repair Stations would have acted differently and the purchasers did not get the benefit of their bargain but were instead conned by Vaisman.

Indeed, the United States anticipates that at trial representatives of a FAA Repair Station will testify that the Repair Station would not accept parts either: (a) obtained from scrap yards; or (b) illegally tampered with, which is one of the reasons they require trace paperwork. Further, the United States anticipates that trial testimony will demonstrate that without the fraudulent documentation a Scrapped Part would be subject to additional testing.

Similarly, evidence will demonstrate that purchasers lost out on a property right and did not receive the desired product. Evidence at trial will demonstrate that purchasers would not buy parts that were either obtained from scrap yards or illegally tampered with. Requiring trace paperwork tracing the parts back to the manufacturer or to an FAA-certified entity, such as an FAA Repair Station, eliminates the possibility of a part slipping through the repair process. This is but one of the reasons Vaisman knew he had to create dummy paperwork – it was the only way to get the millions he desired for Scrapped Parts.

16

Specific purchasers will further testify concerning the Scrapped Parts. One will state that his/her company experienced more than one in-flight engine shutdown relating to blades and vanes it had purchased from Tara Aviation. The individual will further testify that even before Vaisman's scheme became public, the company had stopped buying its parts from Tara Aviation. The representative will also testify that the company would never have bought the Scrapped Parts if the company knew about their history as the parts did not meet their standard.

Another entity will buttress the Government's case. A representative will testify that after learning about Vaisman's scheme and that one of its aircraft had a Tara Aviation part, the company sent the engine to a repair station to replace the Tara Aviation part. This was done at a considerable expense and shows the buyer did not get the benefit of his bargain.

Lastly, upon learning of the scheme, the FAA issued a Safety Alert for Operators ("SAFO") on July 11, 2011. The SAFO alerted operators to Tara Aviation's conduct and stated that they "should remove [the offending blades and vanes] from service," because "they could pose a hazard to flight from an in-flight engine shutdown or contained/uncontained engine failures."

The cases relied on by Vaisman do not merit the relief he seeks. For instance, in United States v. Henry, 29 F.3d 112 (3d Cir. 1994), the Third Circuit affirmed the dismissal of an Indictment on the grounds that the property right alleged was not covered by the bank and wire fraud statutes.

17

However, that case involved banks' right to a fair bidding opportunity for government contracts. Id. at 112. This is a far cry from the victims here who acted on or purchased the Scrapped Parts based upon Vaisman's lies, deceitful actions, and fraudulent paperwork.

United States v. Sadler, 750 F.3d 585 (6th Cir. 2014) is similarly inapplicable. Sadler addressed a situation where the defendant purchased goods (pharmaceutical pills) from distributors at full price, but did so using a fake name and by falsely stating the pills would be provided to indigent individuals. Sadler, 750 F.3d at 590. The Sixth Circuit reversed the convictions in light of its finding that the distributors were not deprived of property because they were paid full price on time. Id. Here, to the contrary, parties worked on and purchased Scrapped Parts that were not the goods (as they lacked true certifications and trace paperwork) they believed they were purchasing.

Finally, the decisions in McNally v. United States, 483 U.S. 350 (1987), United States v. Zauber, 857 F.2d 137 (3d Cir. 1988), United States v. Starr, 816 F.2d 94 (2d Cir. 1987), United States v. Novak, 443 F.3d 150 (2d Cir. 2006), and United States v. Shellef, 507 F.3d 82 (2d Cir. 2007), actually support the Government's, not Vaisman's, position. Those cases stand for the proposition that there is no loss of property right if the victim received what it paid for and desired to receive. As an example, in Starr, the victim paid the defendants to process the victim's bulk mailings. Although the defendants

18

defrauded the government by underpaying for the mailings, the Court found that there was no fraud against the people paying for the services because the victim received exactly what it paid for – the mailings.

In sum, Vaisman fails to provide a case on point to support his position. This is likely because the facts of the case and common sense show that FAA Repair Stations would not accept the Scrapped Parts and purchasers would not buy they Scrapped Parts if they had known the truth. This is why Vaisman knew he had to create fake and fraudulent paperwork. Clearly Vaisman defrauded others out of money and property and his motion should be denied.

### C. The Mail and Wire Fraud Counts Properly Allege a Scheme and Artifice to Defraud and State Material Misrepresentations and Omissions.

The mail and wire fraud charges similarly properly allege a scheme and artifice to defraud. First, as Vaisman concedes, the intent to defraud can be based upon intentional or reckless material misstatements or misrepresentations. United States v. Coyle, 63 F.3d 1239 (3d Cir. 1995); see also United States v. Pearlstein, 576 F.2d 531, 536 (3d Cir. 1978) (reckless disregard supports an inference of fraudulent intent). Here, the certifications and paperwork that Vaisman created stated that the parts at issue were "not subject to severe stress or heat." These statements were at least reckless and could not have been made in good faith because Vaisman lacked knowledge of the Scrapped Part's history. Further, the certifications contained a digital cut-and-paste signature of the sole publicly known employee of Tara Aviation, an

19

act that was done without his knowledge or permission. This was, in effect, a misstatement and misrepresentation that Tara Aviation's sole publicly-known employee was certifying the parts, when in fact it was Vaisman causing the part to be certified. Moreover, the document itself was a fraudulent misrepresentation. The document in and of itself is a statement that supports the integrity of the Scrapped Part. The fact that here the certification was done without the requisite knowledge, and omitted that the history of the part was not known, is the true deception.

Further, the paperwork ultimately passed on to end-users omitted important information as well. Specifically, none of the paperwork evidencing the purchase of the parts from scrapyards was ever included with the parts, nor was the paperwork evidencing the illegal maintenance on the parts. The last omission is particularly important, because all maintenance or alteration of an aircraft part must by law be documented in records accompanying the part. See 14 C.F.R. § 43.9(a).

Additionally, as explained in the Indictment and above, Vaisman repeatedly caused FSI, a company of which he owned 49 percent, to engage in sham transactions with Tara Technology. In these transactions paperwork would indicate that a part traced back to FSI, a FAA certified Repair Station. These fraudulent certifications falsely acted as proof that the part could be tracked to a FAA certified Repair Station (FSI) which bolstered the part's integrity. These sham certifications were provided in response to potential

20

purchasers' specific demands for such certifications as a precondition of sale. In reality, though, FSI never actually owned the part and the part never left Tara Technology's warehouse. It is hard to imagine a better example of a scheme to defraud.

Vaisman's claim that the Indictment fails to allege a scheme to defraud is also belied by common sense. If the misrepresentations and omissions were not material and in furtherance of a scheme to defraud then: (a) why would Vaisman go through the trouble of grit-blasting and blending the parts in violation of the law, in part to conceal, among other things, defects in the parts or that the parts were previously rejected, (b) why would Vaisman not reveal the true history of the Scrapped Part (and instead cause material omissions) in submitting it to a repair station, (c) why would Vaisman cause the fake transactions between Tara Technology and FSI to take place, leading to material false statements, representations, and omissions, (d) why would Vaisman cause Tara Aviation's sole publicly known employee's signature to be digitally used without his knowledge or permission, (e) why would Vaisman feel the need to submit false and misleading FSI certifications to end users, and (f) why would Vaisman hide the true history of the Scrapped Part from the end user? The answer is simple – Vaisman took and caused the above acts, material misstatements, and material omissions in furtherance of his scheme to defraud others and realize significant profits.

21

### D. The Tax Counts Properly Allege the Charged Offense.

Vaisman next incorrectly argues that counts sixteen through twenty-three must be dismissed as the Indictment fails to allege an intent to evade tax. Counts sixteen to twenty-three, though, do properly allege violations of 26 U.S.C. § 7206(1). Section 7206(1) states that a person commits a crime if the person-- "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter. . . ." The elements of this offense are:

First: That *(name)* made and subscribed and filed an income tax return *(statement) (document)*;

Second: That the tax return *(statement) (document)* [(contained) *(is verified by)*] a written declaration that it was made under the penalties of perjury;

Third: That the return was false regarding a material matter;

Fourth: That *(name)* did not believe the return *(statement) (document)* was true and correct as to that material matter; and

Fifth: That *(name)* acted willfully.

Third Circuit Model Jury Instruction, § 7206. The elements clearly set forth what the Government must prove to sustain a conviction. Nowhere do they mandate that the Government must allege or prove that a defendant intended to evade a tax.

22

Vaisman even recognizes his motion is lacking. He concedes that "the government did not charge Defendant Vaisman with tax evasion under 26 U.S.C. § 7201" and that a "difference between Section 7201 and Section 7206(1) [charged here] is that under the former the government must allege and prove a willful attempt to evade taxes." Defendant's Brief, p. 24. Vaisman nonetheless argues that the Court should add on this additional burden.[2] The only case he provides as support, a tax court case from roughly 65 years ago, fails to support his position. Grenada Industries v. C.I.R., 17 T.C. 231 (1951), aff'd 202 F.2d 873 (5th Cir. 1953), a civil case, concerned the proper allocation of income. The Court stated that while ownership of multiple entities is permitted, one cannot use that common ownership to evade the payment of taxes. The case did not involve a charge pursuant to 26 U.S.C. § 7206(1), a discussion of its elements, or the willful filing of a false tax return. It is completely inapplicable to the present matter. In sum, the statute and the Third Circuit Model Jury Instructions state what the United States must prove and the United States properly alleged the requisite facts and elements in the Indictment. The Court should therefore deny Vaisman's motion.

---

2 The United States notes that although Vaisman's Table of Authority is six pages long he fails to supply any authority following this sentence of his brief or provide any case where a Court added on this additional element to a 26 U.S.C. § 7206(1) charge.

### E. The Title 26, United States Code, Section 7206(1) Charges are not Vague as Applied to Vaisman and Properly Allege Willfulness.

Vaisman next seeks to have the court dismiss the Title 26, United States Code, Section 7206(1) charges alleging the statute is constitutionally vague as applied to him and fail to allege willfulness. A penal statute is void for vagueness "only if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes . . . arbitrary and discriminatory enforcement." United States v. Moyer, 674 F.3d 192, 211 (3d Cir. 2012) (internal quotation marks and citations omitted). That principle "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." Rose v. Locke, 423 U.S. 48, 49 (1975). In other words, "[a] statute need not spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds." United States v. Hager, 721 F.3d 167, 183 (4th Cir. 2013) (citation omitted). Instead, constitutional vagueness concerns "rest on . . . lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." Maynard v. Cartwright, 486 U.S. 356, 361 (1988). "Criminal statutes, therefore, need only give fair warning that certain conduct is prohibited to withstand a constitutional challenge." Moyer, 674 F.3d at 211 (internal quotation marks and citation omitted). Under these standards, the application of 26 U.S.C. § 7206(1) is not vague as applied to Vaisman.

24

First, Vaisman's motion fails as he does not even address part of the charged conduct. Indeed, the Indictment clearly states that "Vaisman received the approximate funds indicated [listed in counts 16, 18, and 19] from Tara Aviation that he caused to be concealed in Tara Aviation's and Tara Technology's accounting records as bogus aircraft parts sales by Tara Technology. . . ." Indictment, Counts 16-19, ¶ 6. The Indictment then not once but twice specifically states in each of these counts the income he received – that is Tara Aviation's payment to other parties for the purchase of artwork and a harp for Vaisman's personal use. Indictment, Counts 16-19, ¶¶ 6 and 10. Obviously, the statute gave Vaisman fair warning that failing to list income he personally received from a company he owned is a violation of the statute. For this reason alone, his motion fails.

Second, Vaisman concedes he is guilty if he knew he had to report the Tara Aviation income and did not report the income. Defendant's Brief, p. 27. Here, the evidence at trial will demonstrate that, as charged and explained in the Indictment, Vaisman owned and controlled Tara Aviation. The evidence will also demonstrate that as stated in the Indictment Tara Aviation and Tara Technology were one company. The Indictment specifically states that Vaisman maintained Tara Aviation inventory at Tara Technology and caused Tara Technology employees to work on Tara Aviation matters. Indictment, Count 1, ¶ 1(h)(iii). The Indictment states and evidence will further show that Vaisman listed Tara Technology's income on his personal returns. Indictment, Counts

25

16-19, ¶ 4. Further, the Indictment demonstrates that Vaisman caused Tara Technology to file returns and list its income on those returns. Indictment, Counts 20-23. It is therefore clear that Vaisman was aware of the need to file corporate and personal returns and the requirement to put Tara Aviation's income on those returns. There can be no doubt that the statute charged provided Vaisman the reasonable opportunity to understand what conduct it prohibits or authorizes – here the failure to report income from a company he owned – and does not authorize arbitrary and discriminatory enforcement.

Not surprisingly, Vaisman cannot provide this Court with one case where a Court held that 26 U.S.C. 7206(1) was vague either in its entirety or as applied. The closest Vaisman can come is United States v. Mallas, 762 F.2d 361 (4th Cir. 1985). In Mallas, the Fourth Circuit reversed convictions, including two under 26 U.S.C. § 7206(1). In addressing that law, the Fourth Circuit stated that one needs to acts willfully to violate that statute and that because the law concerning "annual advance minimum royalties that are recoupable from warranted coal reserves acquired after execution of a lease but before payment" was unclear, the defendants could not willfully have violated the statute. Mallas, 762 at 363-365. Here, the situation is clear – Vaisman knew he owned and controlled Tara Aviation, knew that he had to file personal and corporate returns, and knew that he had to report income for the entities he owned. Hence, the statute is not vague as applied and the motion should be denied.

26

Similarly, Vaisman's argument that the tax counts should be dismissed as they fail to allege the element of willfulness (Defendant's Brief, p. 30) is without merit. The Indictment states that "[o]n or about the dates enumerated below . . . Vaisman did knowingly and <u>willfully</u> make a subscribe . . ." a false tax return knowing it to be false concerning a material matter. Indictment, Counts 16-19, ¶ 10 (emphasis added). The Indictment further alleges that Vaisman knew the returns were not true to every material matter as they failed to include "net earnings of Tara Aviation, his alter ego [that is, his company]; and (b) where indicated, withdrawals for purchases of luxury artwork." Indictment, Counts 16-91, ¶ 9. The Indictment further states that Vaisman knew he had to report income from his companies on his personal tax returns in stating that Vaisman did report Tara Technology's income on his personal returns. Indictment, Counts 16-91, ¶ 4. Thus, the Indictment sufficiently alleges conduct that, if proved, would remove all doubt that Vaisman knew what he was doing was wrong. Indeed, the Third Circuit has held that the requirement of "a *mens rea* element makes it less likely that a defendant will be convicted for an action committed by mistake." Accordingly, the Third Circuit Model Instructions states that

> The offense*(s)* of *(state offense or offenses that include willfully)* charged in the indictment require*(s)* the government to prove that *(name)* acted "willfully" with respect to an *(certain)* element*(s)* of the offense*(s)*.   This means the government must prove beyond a reasonable doubt that *(name)* knew *(his) (her)* conduct was unlawful and intended to do something that the law forbids.   That is, to find that *(name)* acted "willfully," you must find that the

27

evidence proved beyond a reasonable doubt that *(name)* acted with a purpose to disobey or disregard the law. "Willfully" does not, however, require proof that *(name)* had any evil motive or bad purpose other than the purpose to disobey or disregard the law.

Third Circuit Model Jury Instruction, § 5.05. The United States welcomes that burden and will meet it at trial. What Vaisman is actually arguing is that he did not commit the alleged acts willfully, not that the Indictment did not allege willfulness. This, though, is an issue for trial, not a motion to dismiss.

Clearly 26 U.S.C. 7206(1) is not vague as applied to Vaisman and the Indictment properly alleges willfulness. Thus, the motion to dismiss on these grounds should be denied.

F. There are no Statute of Limitations Violations.

There are no statute of limitation violations and the Court should deny Vaisman's motion to dismiss on this ground. Count One of the Indictment charges a mail and wire fraud conspiracy ending "in or about July 2009." Counts two through ten charge substantive mail fraud violations, with the earliest charged offense occurring on February 15, 2007. Counts Eleven through Fourteen charge substantive wire fraud violations, with the earliest charged offense occurring on October 16, 2008. Count Fifteen charges a conspiracy in to commit fraud involving aircraft parts ending "in or about July 2009." These charges all have a five-year statute of limitations. 18 U.S.C. § 3282(a).

Counts Sixteen through Twenty-Three of the Indictment charge Vaisman will filing false tax returns, in violation of Title 26, United States Code, Section

28

7206(1). These counts all have a six-year statute of limitations. The earliest filing in September 4, 2006.

The statute of limitations in this case were tolled by several Mutual Legal Assistance Treaty requests.   On or about June 9, 2010, the Honorable Stanley R. Chesler, United States District Judge for the District of New Jersey, signed an order stating that pursuant to Title 18, United States Code, Section 3292, the "running of the statute of limitations for violations of Title 18, United States Code, Sections 38, 1001, 1341, 1343, 1349, 1956, and 1957, and of Title 26, United States Code, Sections 7201 and 7206, is hereby suspended beginning on April 28, 2010, the date on which the official request was made, until the date on which the Guernsey authorities take final action on such request. . . ." Guernsey's initial production let to follow up requests and a supplemental MLAT request. Thus, on October 28, 2013, the Honorable Kevin McNulty, United States Judge for the District of New Jersey, signed an order stating that pursuant to Title 18, United States Code, Section 3292, "running of the statute of limitations for violations of Title 18, United States Code, Sections 38, 1001, 1341, 1343, 1349, 1956, and 1957, and of Title 26, United States Code, Sections 7201 and 7206, is hereby suspended beginning on May 24, 2012, the date on which the official request was made, until the date on which the Guernsey authorities take final action on such request. . . ." Guernsey took final action on or about November 12, 2013, when it sent its final responsive documents in an e-mail.

29

In addition, on February 24, 2012, the Honorable Jose L. Linares, United States District Judge for the District of New Jersey, signed an order stating that pursuant to Title 18, United States Code, Section 3292, the "running of the statute of limitations for violations of Title 18, United States Code, Sections 38, 1001, 1341, 1343, 1349, 1956, and 1957, and of Title 26, United States Code, Sections 7201 and 7206, is hereby suspended beginning on February 8, 2012, the date on which the official request was made, until the date on which the France authorities take final action on such request. . . ." France took final action on the request on or about October 30, 2012, when it sent via Federal Express documents responsive to the request. Thus, the period from April 28, 2010 through November 12, 2013 is excludable pursuant to 18 U.S.C. § 3292.

Vaisman has also personally executed a waiver of the statute of limitations for the charged offenses. According to his own submission, Vaisman entered into seven tolling agreements that tolled the statute of limitations from February 11, 2014, through May 13, 2015.

The Grand Jury returned the pending Indictment on July 10, 2015.

In light of the above, the charged conduct is within the applicable statute of limitations and the Court should deny Vaisman's motion to dismiss on this ground.

## 2. THE COURT SHOULD NOT SUPPPRESS EVIDENCE OBTAINED DURING AUTHORIZED, PROPERLY EXECUTED, SEARCHES

### A. Background

In or about October 2008 a witness contacted the FAA following an engine failure during a commercial flight in August 2008. The witness was employed at Tara Technology at the time and had also worked for ITC.

The witness told the FAA, and later the DOT-IG, among other things, that Vaisman, along with others, was performing illegal repairs on aircraft parts and was creating fraudulent trace paperwork to hide the illegal conduct. The witness further stated that Vaisman had been engaged in this activity since at least as early as 1989. The witness provided a detailed explanation of the fraud, from the purchase of the Scrapped Parts to the illegal maintenance work to the creation of fraudulent paperwork to the submission of the Scrapped Part to a Repair Station to the ultimate fraudulent sale of the Scrapped Parts. The witness confirmed that the Repair Stations and purchasers were not told of the true history of the Scrapped Part. The witness additionally stated his basis of knowledge for the information – the witness admitted that he himself had taken part in the illegal conduct.

In response, FAA personnel asked the witness, in substance and in part, if he could provide Shelby Certifications and other documents that support his statements. At no time did they ask or instruct the witness to go to Tara Technology and obtain these documents. There was every reason to believe the documents were already in his possession or obtainable from other locations.

31

Indeed, this is often the situation involving a whistleblower/company employee.

On or about February 25, 2009, DOT-IG Special Agents conducted their initial interview with the witness. At or about that time, and thereafter, DOT-IG SA McGrade told the witness, in substance and in part, not to conduct any unauthorized searches of Tara Technology. As a result, while the witness called SA McGrade on several occasions to discuss documents he came across as part of his job at Tara Technology, only twice did he, at SA McGrade's request, provides documents to SA McGrade: (1) a facsimile from Corviello to Vasiman which, in substance and in part, described their criminal scheme; and (2) a series of approximately five e-mails between the witness and two FSI employees (which the witness provided after the July 2009 search and which e-mails were recovered from the July 2009 search).

Based in large part upon the witness's statements, law enforcement applied for a search warrant to search Tara Technology's Office. On or about July 17, 2009, the Honorable Madeline Cox Arleo, at that time a United States Magistrate Judge for the District of New Jersey, signed the warrant. In order to conduct the search in an orderly fashion and with the minimal intrusion possible, authorized law enforcement requested that FAA personnel with a greater degree of knowledge concerning engine blades and vanes (the parts at issue) aid the search.

The search, though, did not stop Vaisman's illegal activity. In 2013, law enforcement became aware that, as described above, Vaisman was using FSI to

32

conduct sham transactions with Tara Aviation in order to create materially fraudulent paperwork when purchasers demanded such paperwork as a condition of the sale. The evidence supporting this allegation included a recorded conversation during which Vaisman instructed a FSI employee to manufacture what he knew to be false Part 145 paperwork for Tara Aviation parts, and to send the paperwork to Tara Technology's business address. In response, law enforcement applied for a second warrant to search Tara Technology's business office. On or about May 13, 2013, the Honorable Madeline Cox Arleo, at that time a United States Magistrate Judge for the District of New Jersey, signed the warrant.

### B. Standing

As a preliminary matter, Vaisman has not established that he has standing to move to suppress all of the evidence that was seized from Tara Technology pursuant to the search warrants issued in this case. In fact, he does not even attempt to establish standing, which is unsurprising given the law, but which is fatal to his motion, as he carries the burden of establishing that he had a reasonable personal expectation of privacy in the place searched. See, e.g., United States v. Stearn, 597 F.3d 540, 550-51 (3d Cir. 2010). "Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." Minnesota v. Carter, 525 U.S. 83, 90 (1998); see also New York v. Burger, 482 U.S. 691, 700 (1987) ("An expectation of privacy in commercial premises . . . is different from, and

33

indeed less than, a similar expectation in an individual's home."). A defendant seeking suppression of seized evidence must demonstrate a personal connection to the area searched; mere ownership of the business or rank within its hierarchy is insufficient. See United States v. SDI Future Health, Inc., 568 F.3d 684, 695-99 (9th Cir. 2009) (finding insufficient record to affirm district court's holding that co-owners of business had standing to object to search of workplace areas beyond their own personal offices); United States v. Mohney, 949 F.2d 1397, 1403-04 (6th Cir. 1991) (holding that the defendant did not have standing to move to suppress evidence seized from business where he worked, because the warrant targeted the corporation rather than him, he did not prepare the documents he sought to suppress, and he rarely visited the offices from which the documents were seized); United States v. Chuang, 897 F.2d 646, 650 (2d Cir. 1990) (holding that bank officer who owned "almost half" of the bank's stock did not have standing to object to search of another employee's office); United States v. Britt, 508 F.2d 1052, 1055-56 (5th Cir. 1975) (holding that the president of a business did not have standing to move to suppress evidence seized from that business, because the warrant targeted the business rather than him, he did not prepare the documents he sought to suppress, and the documents were seized from a storage facility rather than his personal office). Indeed, courts have found that, to have standing to object to a search performed on business premises, a defendant must show that the areas searched were "given over to the

34

defendant's exclusive use." <u>SDI Future Health</u>, 568 F.3d at 695-96 (citation and punctuation omitted).

Here, Vaisman has not attempted to establish that he had the exclusive use of any area that was searched pursuant to the warrant. While the government is left to guess that, if asked, he would try to demonstrate a personal nexus to the materials in his own personal office or to specific document he authored — although he has not — there is absolutely no basis for concluding that Vaisman had any reasonable expectation of privacy in any other area of Tara Technology's offices. It is thus clear that Vaisman lacks standing to seek suppression of "all evidence" seized from Tara Technology and the Court should therefore deny the motion.

### C. There Were No Unconstitutional Searches

There were no unconstitutional searches in this matter and Vaisman's motion on this ground should be denied. That said, the Court need not even address this issue. Assuming the provision of documents was not permissible, the result defendant seeks, dismissal of the Indictment, is not warranted. Only some of the documents the FAA requested[3] in or about February 2009 were

---

[3] As stated above, the witness, prompted and/or unprompted, provided documents, including those referred to in the February 4, 2009 and February 5, 2009 FAA logs. He also brought a blade from Tara Technology to a meeting with the FAA. In addition, the witness provided a hand-drawn map, notes and pictures of Scrapped Parts to law enforcement in connection with the July 2009 search. The majority of the documents the witness provided to the FAA were not even provided to the DOT-IG or the United States Attorney's Office until well after Vaisman's arrest.

used in passing in the July 2009 search warrant affidavit. In fact, those documents are only referred to in one portion of one paragraph of the affidavit. July 2009 Affidavit, ¶ 19. The preceding ten paragraphs described the first hand observations and knowledge of the witness. A review of the affidavit reveals that it established probable cause through the statements provided by the witness alone. Thus, even if the Court were to find that obtaining the documents was in error, the warrant survives. See, e.g., Franks v. Delaware, 438 U.S. 154, 171 (1978); United States v. Carter, 530 F. App'x 199, 203 (3d Cir. July 16, 2013) (not precedential); United States v. Herrold, 962 F.2d 1131, 1140-44 (3d Cir. 1992); United States v. Calisto, 838 F.2d 711, 715-16 (3d Cir. 1988); United States v. Johnson, 690 F.2d 60, 63 (3d Cir. 1982); United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987).

This case is distinguishable from the cases provided by Vaisman. Those cases involved situations where law enforcement officers actually conducted the illegal activity and the illegally obtained evidence was crucial to the prosecution. See Murray v. United States, 487 U.S. 533 (1988) (where law enforcement forced their own entry into a warehouse and then observed marijuana in plain view); United States v. Buchanan, 904 F.2d 349 (6th Cir. 1990) (where drug enforcement agents conducted a warrantless search of a house and thereby recovered narcotics they would not have recovered without the illegal search). In this matter, the Government was building a case against Vaisman and his conspirators and did not need the obtained documents to

36

support its search warrant application. Indeed, the affidavit sets forth more than probable cause even if the reference to the documents was removed from the affidavit. Thus, suppression of evidence or dismissal of the Indictment is not merited even if Vaisman's position is correct.

Further, there were no warrantless searches. Vaisman claims that in February 2009 the FAA instructed an individual who was speaking with them and who worked at Tara Technology to conducted an illegal search of Tara Technology. As explained above, at no time did the FAA personnel instruct the witness to obtain documents from Tara Technology. Instead, they merely inquired if the witness could provide either specific documents they sought or documents to support the witness's claims.

Vaisman further alleges that the witness "took this early directive from the FAA as a license to seize numerous other documents and supply information for the next six months. . . ." Defendant's Brief, p. 38. To the contrary, SA McGrade told the witness not to access or attempt to access any document at Tara Technology that he did not have access to as part of his daily work. Not surprisingly, after SA McGrade so advised the witness, the witness only provided documents he obtained from Tara Technology SA McGrade on two occasions. First, as discussed in the affidavit, was the facsimile from Coviello to Vaisman that the witness observed as part of his regular daily work activity. Second, after the July 2009 search warrant was executed, the witness provided approximately five e-mails between himself and two individuals who

worked at FSI (emails that law enforcement recovered as part of the 2009 search).

The witness lawfully shared these documents to law enforcement. The witness had access to these documents as part of his employment and was therefore permitted to copy and provide the documents to law enforcement. See United States v. Miller, 800 F.2d 129, 134 (7th Cir. 1986) (in a matter not involving a government informer, the court found there is a difference between documents an employee has "legitimate" access to and those that the employee does not observe in his daily function); see also United States v. Zipperstein, 601 F.2d 281, 289-290 (7th Cir. 1979) (although not done at the government's instruction, employee permitted to provide documents he observed in his daily basis as employer had no expectation of privacy in those documents). Here, the witness told law enforcement prior to provision of the documents that he came across them as part of his daily work. Clearly, in light of the limited amounts of documents provided and the method through which he provided the documents, the witness did not conduct broad inspections of Tara Technology documents for DOT-IG's benefit. Thus, the documents were properly obtained.

In sum, law enforcement never tasked the witness to conduct an impermissible search of Tara Technology for evidence. Further, the July 2009 search warrant demonstrates probable cause even if the few sentences about the documents are removed. The Court should therefore deny defendant's

38

motion to dismiss the Indictment on this ground.[4]

    D. There were no False Allegations in the Search Warrant
       Affidavits.

Vaisman next argues that all the seized evidence should be suppressed because the government intentionally rendered false statements in both the 2009 and 2013 search warrant affidavits. Search warrant affidavits enjoy a presumption of validity. Franks, 438 at 171. In overcoming this presumption, and to obtain even a hearing on the merits of his claim, Vaisman must make a preliminary showing that the affidavit in support of the warrant was deliberately false or demonstrated reckless disregard for the truth, and that any challenged statement or omission was essential to the magistrate judge's finding of probable cause. See id. at 171-72; Calisto, 838 F.2d at 714. In attempting to make this preliminary showing, the defendant must present "an offer of proof" contradicting the affidavit, and "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." Id. And even assuming the defendant overcomes this burden of establishing deliberate or reckless falsehoods in the affidavit, he must still prove by a preponderance of the evidence that probable cause would

---

4 Vaisman argues in a separate section that the Court should dismiss the Indictment based upon an alleged unsupervised informant. This merely rehashes the argument concerning warrantless and should be denied for those same reasons. As demonstrated above, law enforcement did supervise the witness. Moreover, even if the Court found inadequate supervision, the motion should be denied as the alleged wrongful conduct fails to rise to the level of outrageous government or law enforcement conduct that would warrant dismissal of the Indictment.

not exist without the false statements. Id. at 171-72.

Here, Vaisman asserts that both affidavits contained the false statement that "FAA Repair Stations use historical or 'trace' paperwork associated with an aircraft part to determine whether that aircraft part is repairable and ultimately airworthy." Defendant's Brief, p. 40. Second, Vaisman alleges that the affidavits contained false statements that his scheme "is ultimately creating a significant risk to public safety" (2009 Affidavit) or that his scheme "was creating a potential risk to public safety." (2013 Affidavit).

Vaisman, though, provides no offer of proof or affidavit in support of this conclusion. This is not surprising as the facts demonstrate that the assertions are correct. As stated in the Indictment and as will be shown at trial, FAA Repair Stations use historical or trace paperwork to determine if they will even accept the part for repair and, if so, what work will be done on the part. Vaisman offers no facts to counter this reality. Instead, he argues that since Repair Stations have to follow FAA standards they cannot solely rely on historical or trace paperwork. Nowhere does Vaisman argue, though, that the FAA Repair Stations do not rely on the paperwork to determine whether to accept the part or decide what works needs to be done, that is, rely on the paperwork as part of making their airworthiness determinations. Almost more importantly, Vaisman's actions in submitting fraudulent historical and/or trace paperwork for nearly twenty years shows he knew that Repair Stations rely on this paperwork and knows now that the statements in the affidavits are

40

accurate.

Similarly, SA McGrade's statements about the risk to public safety are also accurate, and definitely not recklessly false. The statement in the 2013 Affidavit, that "this scheme was creating a potential risk to safety," is simply addressed. In 2011, the FAA issued the SAFO based upon Vaisman's fraudulent actions. The SAFO alerted operators to Tara Aviation's conduct and stated that they "should remove [the offending blades and vanes] from service," because "they could pose a hazard to flight from an in-flight engine shutdown or contained/uncontained engine failures." SA McGrade's statement in the 2013 affidavit of potential risk cannot be deemed reckless or intentionally false in light of the SAFO.

SA McGrade's statement in the 2009 affidavit that Vaisman's actions were "creating a significant risk to public safety" is also accurate. It is unquestioned that Vaisman's use of fraudulent documents caused Repair Stations to accept, and users to buy, products that did not meet their safety standards. As explained above, purchasers would refuse to buy parts that were purchased from scrap yards or which someone illegally tampered with, for instance removing a rejection marking from a part. This was the very reason for Vaisman's scheme, to get parts sold that would not be sold if the truth was known about them. This, in turn, leads to only one reasonable conclusion – that the sale of these parts presents a risk (and in and airplane a significant risk) and that the statement was not intentionally or recklessly false.

41

Moreover, assuming Vaisman could make a preliminary showing that there were intentionally false or reckless statements, his motion still fails. These statements were not essential to the Judges' finding of probable cause. Indeed, the affidavits set forth probable cause even if these statements were removed. Vaisman fails to even argue that removal of these statements concerning risk would have affected the probable cause determination. Instead, he offers only red herrings and irrelevant smears against the government. Consequently, the Court should reject his motion.

E. The 2009 Search Warrant was not a General Search Warrant.

Vaisman also wrongly claims that evidence must be suppressed as the 2009 Search Warrant was a general warrant. The Supreme Court held in Andresen v. Maryland, 427 U.S. 463, 480-82 (1976), that a warrant is sufficiently particular, and not general, if it does nothing more than specify the crime or crimes regarding which evidence is sought. The search warrant application and affidavit here, the latter of which was expressly identified on the face of the search warrant itself, alleged the categories of documents to be seized were evidence, fruits, or instrumentalities of violations of certain enumerated federal statutes. (See July 2009 Search Warrant Affidavit). The application and warrant then took the additional step of particularizing that evidence further by describing the specific types of evidence, fruits, and instrumentalities of the specified federal offenses that the agents were authorized to seize and by placing a date limitation on the scope of the records

42

to be seized. Both <u>Andresen</u> and a long line of subsequent Third Circuit precedent make clear that this language places the warrant well outside the realm of the "general." <u>See</u> <u>United States v. Tracey</u>, 597 F.3d 140, 154 (3d Cir. 2010) (warrant not "general" where it authorized agents to search for evidence relating to "the possible exploitation of children," and the supporting affidavit, though not expressly incorporated in the warrant itself, made reference to a specific statutory provision criminalizing the possession and distribution of child pornography); <u>United States v. Yusuf</u>, 461 F.3d 374, 395 (3d Cir. 2006) (warrant not "general" where it authorized agents to search for evidence of specific federal offenses, limited in time to an 11-year period, and "pertaining to" a list of certain individuals and entities); <u>United States v. Conley</u>, 4 F.3d 1200, 1208 (3d Cir. 1993) (warrant not "general" where it authorized agents to seize items "indicative of a gambling operation"); <u>United States v. Christine</u>, 687 F.2d 749, 753 (3d Cir. 1982) (warrant not "general" where it authorized agents to seize "all . . . documents, papers, instrumentalities and fruits of the crime of submission of false statements in connection with the HUD Title I Insured Home Improvement Loan program as well as any evidence of a scheme to defraud HUD or Collective Federal Savings and Loan or any other creditor by use of the United States mails").

Instead of addressing the above standard, Vaisman simply lists the categories of documents set forth in Attachment B to the warrant and summarily declares that the warrant authorized seizure of "virtually everything

43

at Tara Technology. . ." (Defendant's Brief, p. 44). This argument is flawed. First, because Vaisman failed to submit an affidavit or other evidence in support of his motion, there is no basis to conclude that Tara Technology contained absolutely no document or object that was not listed on the Attachment B. Second, even if the warrant did authorize seizure of every document from Tara Technology as evidence of the listed offenses, Vaisman fails to explain how or why this would be unconstitutional. So long as a search warrant issues upon probable cause and particularly describes the things to be seized, as was done here, the percentage of documents at a location that fall within the warrant's scope is irrelevant.

The lone case Vaisman provides as on-point support is easily distinguishable. Here, the warrant contains a time limitation, from 1989 to the time of the search, that correlated to the time of the criminal activity. Second, the documents sought were not merely limited to the listed offenses. Indeed, the warrant states that the documents and evidence must relate and pertain to "importing, exporting, transferring, receiving, repairing, using, testing, and returning to service aircraft parts. . . ." July 2009 Search Warrant, Attachment B. This matter is therefore unlike the situation in United States v. Leary, 846 F.2d 592 (10th Cir. 1988), where there was no time limitation and the documents simply related to the violation of two broad statutes. Further, the affidavit in support of the warrant in Leary solely spoke to a "single transaction." Leary, 846 F.2d at 594. Here, the affidavit spoke of a twenty-year

44

long conspiracy (1989-2009) and thus supported seeking a plethora of documents from that time period.

In light of the law and the facts of the case the warrant was proper, was not a general warrant, and the motion should be dismissed.

### F.  Law Enforcement Properly Executed the 2009 Search Warrant.

Law enforcement properly executed the July 2009 Search Warrant. In furtherance of the execution of a warrant, authorized law enforcement officers are permitted to allow other individuals to aid them in conducting the search. 18 U.S.C. § 3105. In this instance, SA McGrade submitted an affidavit seeking authorization to search Tara Technology. July 17, 2009 Search Warrant. In the affidavit, Special Agent McGrade explained that he worked at the Department of Transportation, Office of the Inspector General. The affidavit further explained that in that capacity he had "become familiar with a wide variety of fraudulent schemes and the federal statutes proscribing such fraudulent activity." Significantly, the affidavit did not state that SA McGrade specialized in FAA Regulations, airplanes, Scrapped Parts, engine parts, engine blades, or engine vanes.

The Court authorized SA McGrade and other authorized personnel to execute the search. SA McGrade, in order to not conduct a general search or seize material outside the warrant, sought the aid of FAA personnel who were had more experience and were more specialized in this area. Upon request, FAA Inspectors accompanied authorized law enforcement officers to Tara

45

Technology. Once the authorized law enforcement officers secured the premises, the FAA Inspectors entered the building and aided in the search. As the log Vaisman relies on states, they "pulled a variety of blades and vanes" and then provided them to the supervising and authorized seizing agents, the "DOT IG." Defendant's Brief, p. 48. Nowhere do the logs state that they were the only individuals inspecting parts, that they were involved in the seizure of documents, or that they were involved in the seizure of electronic media. Instead, the FAA Inspectors were on site to aid authorized law enforcement in furtherance of executing the search with the minimal intrusion possible. Indeed, not all aircraft parts were seized. Law enforcement requesting aid to make sure that a search is conducted precisely and with minimal intrusion should be applauded, not employed as a device to seek suppression of evidence. Vaisman's motion should be denied.

G. The 2009 Search Warrant Affidavit Included Protocols for the Review of Electronic Media

Vaisman further argues that seized evidence should be submitted because the July 2009 search warrant lacked protocols concerning the search of electronic media.  The affidavit itself, however, demonstrates this argument is without merit. Among other things, the affidavit states that: (a) seized electronic media "will be transported to an appropriate law enforcement laboratory for review"; (b) the review will be conducted by "personnel appropriately trained in search and seizing" electronic media; and (c) the appropriate personnel will "examine all of the data contained in the" electronic

46

media to "determine whether the data falls within the items to be seized." July 2009 Search Warrant Affidavit, ¶ 22. Moreover, the affidavit explained in detail why law enforcement needed to conduct an off-site examination of electronic media. Id. at ¶ 21. As the affidavit set forth the rational for conducting off-site examination of electronic media and explained how that examination would take place, the Court should deny Vaisman's motion.

3.  THERE IS NO NEED FOR A BILL OF PARTICULARS

The Court should deny Vaisman's request for a bill of particulars. The Federal Rules of Criminal Procedure provide that "[t]he court may order the government to file a bill of particulars." Fed. R. Crim. P. 7(f). "The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971) (quotes and citation omitted). Under the law of this Circuit, a "motion for a bill of particulars should be granted whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." United States v. Rosa, 891 F.2d 1063, 1066-67 (3d Cir. 1989).

A bill of particulars is not an investigative vehicle for the defense, and it is not a discovery tool to obtain either detailed disclosure of the government's

case prior to trial or a list of all overt acts. See United States v. Zolp, 659 F.
Supp. 692, 706-07 (D.N.J. 1987) (citing United States v. Kilrain, 566
F.2d 979, 985 (5th Cir. 1978)).[5] Indeed, the government is not required at the
pretrial stage to "weave the information at its command into the warp of a fully
integrated trial theory for the benefit of the defendant[]." Addonizio, 451 F.2d at
64; see also United States v. Caruso, 948 F. Supp. 382, 395 (D.N.J. 1996)
("Rule 7(f) of the Federal Rules of Criminal Procedure does not require the
United States Attorney to furnish a three dimensional colored motion picture of
the prosecution's proof prior to trial"). Instead, the bill is "intended to give the
defendant only that minimum amount of information necessary to permit the
defendant to conduct his own investigation." United States v. Smith, 776 F.2d
1104, 1111 (3d Cir. 1985). If the defendant can derive this information from
the indictment and discovery, there is no need for the bill to issue. See United
States v. Sourlis, 953 F. Supp. 568, 578-79 (D.N.J. 1996); United States v.
Boffa, 513 F. Supp. 444, 485 (D. Del.), aff'd in part, rev'd in part on other
grounds, 688 F.2d 919 (3d Cir. 1983). This Court should "strike a 'prudent
balance' between the defendant's interest in securing information and the
government's interest in not committing itself to facts before it is in a
position to do so." United States v. Mariani, 7 F. Supp. 2d 556, 560 (M.D.
Penn. 1998) (quoting Rosa, 891 F.2d at 1066). In this balancing, it should be

---

[5] Rule 7(f) also requires a defendant to "move for a bill of particulars before or
within 14 days after arraignment or at a later time if the court permits," but the
government does not oppose the motion on these grounds.

recognized that the bill puts an onerous and potentially unfair burden on the government, because "[g]enerally, when a bill of particulars is furnished to a defendant, the government is strictly limited at time of trial to the particulars which it has specified." Mariani, 7 F. Supp. 2d at 560 n.3.

Here, the Indictment — a "speaking indictment" — provides more than adequate notice of the factual basis for the charges. It sets forth with a fair amount of precision Vaisman's fraudulent scheme, including reference to particular parts in the substantive counts, and describes in detail what Vaisman and others did as part of the criminal activity. See Indictment, Ct. 1. Indeed, the Indictment goes as far as specifically naming and describing co-conspirators (see Indictment, Ct. 1., ¶¶ 1(b) and 1(c)), referring to dates where parts were sold or e-mails were written (see Indictment, Cts. 2-14), and describing where the conspiracy took place (see Indictment, Ct. 1, ¶¶ 1(f) – 1(j)). In sum, the Indictment itself, standing alone, furnishes Vaisman with enough information for a thorough investigation to prepare his defense sufficiently without surprise during the trial and to protect him against a second prosecution for an inadequately described offense. See United States v. Wabo, 290 F. Supp. 2d 486, 490 (D.N.J. 2003) (denying motion for bill of particulars on the basis of specifics in the indictment); Sourlis, 953 F. Supp. at 579 (same); Zolp, 659 F. Supp. at 706-07 (same).

On top of the speaking, detailed, Indictment the government has provided Vaisman with access to a significant amount of discovery. Moreover,

49

as reflected in his brief, Vaisman received documents from the government pursuant to a FOIA request. The detailed speaking Indictment, along with the extraordinary amount of discovery made available and the documents provided pursuant to the FOIA request, more than suffice to defeat defendant Vaisman's motion. See, e.g., United States v. Delle Donna, 552 F. Supp. 2d 475, 497-99 (D.N.J. 2008); United States v. Parlavecchio, 903 F. Supp. 788, 795-96 (D.N.J. 1995); United States v. Giampa, 904 F. Supp. 235, 280 (D.N.J. 1995); United States v. Eisenberg, 773 F. Supp. 662, 688-92 (D.N.J. 1991); Boffa, 513 F. Supp. at 485. But the government in this case has taken its disclosures a step further. It has had numerous meetings wherein the parties discussed the case, including the proofs. Clearly, Vaisman has been supplied with so much more than the central facts, as evidenced by the details set forth in the Indictment, the voluminous discovery provided, the FOIA requests, and the parties' meetings.

Nonetheless, Vaisman requests a bill of particulars in three areas. First, Vaisman has requested the identity of all individuals with whom he conspired. One individual, though, is already specifically named in the Indictment. Another individual is described in the Indictment in a manner that enables Vaisman to know the identity of the individual. Concerning additional individuals, the government should not be required to make a binding legal determination about the status of numerous individuals who were somehow involved in this matter, see Mariani, 7 F. Supp. 2d at 560-61, particularly when

50

Vaisman has solely made general accusations that he will not be able to adequately prepare for trial. Especially in this matter, where Vaisman knows with whom he worked to perpetrate this fraud, where there is a speaking Indictment, and where the Government has provided a significant amount of discovery, Vaisman will be able to prepare his defense and not be subject to surprise without the benefit of this information.

Vaisman also argues that a bill of particulars should be granted concerning the location of the crimes. The speaking Indictment provides sufficient information in this regard. The Indictment identifies parties that were involved, actions they took, and where they and their business entities were located. Moreover, Vaisman alludes to MLATs to Europe in his moving papers. This demonstrates that the Government's discovery has supplemented the Indictment and provided information concerning the location of the crimes. Once again, Vaisman is well-armed with information that will enable him to prepare his defense, not be subject to surprise, and protect himself against a second prosecution.[6]

Third, Vaisman argues that the Government should have to list each and every part that comprised of the offense. Similar to the claims above, the speaking Indictment addresses this concern. For instance, the Indictment

---

6 The argument that Vaisman needs to protect himself from a second prosecution at all is questionable in and of itself in light of his argument concerning the statute of limitations and the dates of the charged offenses (many of which are pre-2010).

51

specifically discusses transactions between Tara Aviation and FSI. Moreover, the substantive wire and mail fraud counts list specific dates. Further, the Indictment makes clear that the trial will involve Shelby's purchase of Scrapped Parts. This specificity, in combination with the discovery, information obtained during the FOIA request, and information learned during the parties' meetings, is more than sufficient. The Government should not at this time be forced to give a detailed and intricate description of the evidence it intends to elicit or provide a list of all overt acts.

In conclusion, Vaisman's request for a Bill of Particulars amounts to nothing more than a fishing expedition in hopes of obtaining "a three dimensional colored motion picture of the prosecution's proof prior to trial," Caruso, 948 F. Supp. at 395, by compelling to government to "weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendant[]." Addonizio, 451 F.2d at 64. Given the combination here of the highly detailed speaking Indictment, the voluminous discovery provided to Vaisman, information obtained pursuant to a FOIA request, and the numerous meetings between the parties, it is unnecessary and would be extremely unfair to compel the government to "commit[] itself to facts" of the most specific and arguably trivial detail "before it is in a position to do so." Mariani, 7 F. Supp. 2d at 560 & 560 n.3. Clearly, the Government has supplied Vaisman with much more than the central facts and he is more than adequately equipped to prepare his defense as well as to avoid

both surprise and the risk of double jeopardy. The motion for a bill of particulars should therefore be denied.

**CONCLUSION**

For all of the reasons set forth above, the Government respectfully requests that the Court deny Vaisman's motions.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
(973) 645-2742


/s/ *Andrew Kogan*
By: Andrew Kogan
Assistant U.S. Attorney


Dated: Newark, New Jersey
December 22, 2016

54